DELAFIELD, *appellant*, and THE STATE OF ILLINOIS, *respondent*.

*Concurrent jurisdiction* is possessed by the *state courts* and the *Supreme Court of the United States*, in all controversies between *a state* and *citizens of another state*.

The contract of an *agent* to be binding upon the *principal* must be within the authority conferred; and if the power of the agent be created by a written instrument, and that be known by the party with whom the contract is made, it must be strictly pursued, and cannot be enlarged by evidence of usage.

Authority to sell, does not authorize a sale on credit, unless it be a known usage of trade that the article in question is ordinarily so sold.

Consent or ratification of the doings of the *agent* may be presumed from the acts or omissions of the *principal*; where however a *state* is the *principal*, acts and omissions which in the case of an *individual* would be deemed sufficient to authorize the presumption, will not be held so.

Where a state passed a law for the borrowing of money and authorized its governor to issue and sell bonds or certificates of stock for the amount borrowed, declaring, however, that the *stock should not be sold for less than its par value*, and empowering the governor to appoint agents to effect the loan; and a loan was effected upon the terms that the money should be paid *by instalments and at deferred periods*, but that *interest should commence immediately* upon the whole sum, and certificates of stock were issued and delivered to the lender: IT WAS HELD, that the contracts were not obligatory upon the state, because the agents had exceeded their authority, *first*, in *selling the stock upon credit*, and *secondly*, in agreeing that the interest should commence running previous to the advance of the money—thus virtually *selling the stock for less than its par value*, and that therefore the state was entitled to a return of the certificates of stock.

*It was further held*, that the approval by the governor of the acts of his agents, the receipt and appropriation of a portion of the proceeds of the certificates, and other acts of acquiescence of executive officers of the state, were not enough to amount to a ratification of the contracts; that they could be ratified *only* by the *legislature*, and inasmuch as it appeared that the legislature, when specially convened for the purpose, *disavowed* the contracts and took measures to recover back the certificates all pretence of ratification failed.

*Certificates of state stock*, certifying a certain amount of money to be due to A. B. *or bearer*, in the hands of subsequent *bona fide* holders are binding upon the state *in faith and honor*; and would be binding in law if the state could be reached by legal judgment, whatever may be the equities existing between the state and the party to whom they were originally issued; it is therefore the proper exercise of the power of a *court of equity* to restrain *by injunction* the transfer of such certificates where a case calling for its interference is established.

1841.

Delafield
v.
The State of
Illinois.

APPEAL from Chancery. The State of Illinois filed a bill in the court of chancery of this state, against Delafield, praying for a decree that the defendant deliver up to be cancelled, bonds or certificates of stock issued by the State of Illinois, to the amount of $583,000, which he obtained under certain agreements, entered into between him and certain agents of the state of Illinois, in the making of which agreements, it was alleged that the agents of the state had exceeded the authority conferred upon them; that the agreements be declared void; that a receiver be appointed to take charge of such of the bonds as remained in the possession of Delafield, and of the proceeds of such as had been disposed of by him; and that an injunction issue restraining Delafield from negotiating or otherwise disposing of such of the bonds as remained in his possession, and of the proceeds of such as had been negotiated by him.

On the 9th January, 1836, an act was passed by the legislature of Illinois, entitled "An act for the construction of the Illinois and Michigan canal," whereby the governor of the state was authorized to negotiate a loan on the credit and faith of the state to the amount of $500,000, to aid in the construction of the canal; *the money to be required to be paid by instalments* as the same might be needed; and the governor was authorized to issue *certificates of stock* for the loan, to be signed by the auditor and countersigned by the treasurer of the state, bearing an interest not exceeding six per cent per annum, payable semi-annually, at the Bank of the State of Illinois, or any of its branches, or at some bank in the city of New-York, Philadelphia, Boston, or either, as might be agreed upon, and reimbursable at the pleasure of the state, at any time after the year 1860. The governor was also authorized to cause the certificates of stock, when created, to be sold; but the act *forbade the stock to be sold for less than its par value.* On the 23d February, 1839, a further act was passed by the legislature of Illinois, authorizing the borrowing of a fur-

1841.

Delafield v. The State of Illinois.

ther sum of $4,000,000, to aid in the construction of the same canal, empowering the governor to execute *bonds* for and in behalf of the state, to be signed by him, countersigned by the auditor, and the seal of the state to be affixed. The act further declared that it should be deemed a good execution of the power to borrow, to sell the bonds, which should be so framed as that they should be in form and substance, certificates of stock, and should be called the "Illinois and Michigan Canal Stock." The governor was authorized to appoint agents to sell and transfer the bonds, the same however *not to be sold for less than their par value.* The act required, that in contracting for loans, provision should be made for the reception of the money by the state in sums of $100,000, as the same might be wanted, &c. In pursuance of these acts, the governor caused 300 instruments in writing to be prepared, which were signed by him and the auditor, countersigned by the treasurer, and the seal of the state affixed, numbered from 1001 to 1300 both inclusive, which instruments were in tenor and effect as follows: "Know all men by these presents, that there is due from the State of Illinois, to the State Bank of Illinois or bearer, one thousand dollars, lawful money of the United States, with interest at the rate of six per centum per annum payable half-yearly, on the first Mondays of January and July, at the Bank of the United States in Philadelphia, or at its agency in New-York, at the option of the holder, on the presentation and surrender of the annexed warrants. The principal is reimbursable at either of the above places, at the pleasure of the state, after the year 1860. For the performance of all which, the faith of the State of Illinois is irrevocably pledged, as also the property, tolls and revenues of the Illinois and Michigan Canal, agreeably to an act entitled "An act for the construction of the Illinois and Michigan Canal," approved the 9th January, 1836. In witness whereof, the governor, auditor and treasurer of the State of Illinois, have signed this certificate, and have caused the seal of the said state to be hereunto affixed, this first day

1841.

Delafield v. The State of Illinois.

of July, 1837." These bonds it is alleged in the bill, were placed by the direction of the governor of Illinois, in the hands of M. M. Rawlings and J. Reynolds, as agents for the sale of the same, and on the 23d April, 1839, *Rawlings* and *Reynolds* entered into a contract with Delafield, a banker in the city of New-York, whereby they transferred to him the 300 bonds or certificates of stock, particularly describing them, and covenanting that they should be delivered to Delafield on or before the tenth day of *June* then next, and that *the interest should commence running on the same*, in favor of the holders thereof, from the day of such delivery. Delafield, on his part covenanted, that within fifteen days after the delivery to him of the bonds, he would place to the credit of *M. M. Rawlings*, in a banking company in the city of New-York, $50,000 to be drawn for by drafts at ten days' sight; that he would pay, *at New-York*, $50,000 on the first day of *August*, to the Bank of Illinois or its agent, in bank notes of some bank or banking association of the city of New-York; and in like manner and at the same place pay $50,000 on the first days of *September*, *October*, *November* and *January*, then next. So much in relation to the bonds for $300,000.

As to the bonds for $283,000: On the 23d day of February, 1837, the legislature of Illinois had passed an act entitled "An act to establish and maintain a general system of internal improvement," whereby provision was made for the election by the legislature of a *Board of Fund Commissioners* to consist of three members, a majority of whom to be a quorum for the transaction of business, and who were authorized to contract for and negotiate all loans authorized to be effected by the legislature, on the faith and credit of the state, for objects of internal improvement, and to *sign and execute bonds or certificates of stock.* The legislature then authorized a loan to the amount of eight millions of dollars, to bear an interest not exceeding six per centum per annum; the principal to be reimbursable at the pleasure of the state at any time after

1841. Delafield v. The State of Illinois.

1st January, 1870; the loans to be so negotiated that the *proceeds might be drawn for as the money would be required* for the progress of any of the works of internal improvement. The commissioners to issue for such loans, transferrable certificates, which when signed by them, or a majority of them, and countersigned by the auditor of public accounts, it was declared should be valid and binding on the state. Before any loan was effected under this act, a supplementary act was passed, that the stock and bonds of the state should not in any event be sold by the commissioners *for less than par value.* On the 1st day of January, 1838, bonds or certificates of stock to a large amount, substantially in the form of the bond or certificate issued by the governor, as above stated, except that the principal was made reimbursable by the state in 1870, instead of 1860, were executed by Charles Oakley, M. M. Rawlings, and Thomas Mather, who, at the time, constituted the *Board of Fund Commissioners* of the state. *On the seventh day of May*, 1839, Oakley and Rawlings still being members of the Board of Fund Commissioners, and having in their possession two hundred and eighty-three of the bonds or certificates of stock executed on the 1st day of January, 1838, each of said bonds being for the sum of one thousand dollars, entered into a contract with Delafield, whereby they transferred to him the said two hundred and eighty-three bonds, numbered from 2205 to 2487 inclusive, and stipulated that *interest should commence running on the bonds in favor of the holders thereof from the date of the contract.* Delafield, on his part, covenanted to pay for the bonds as follows: that he would place the sum of $50,000 to the credit of the Bank of Illinois, at Shawneetown, subject to the drafts of the cashier of the Bank, payable on or after the 1st day of December, 1839; that he would pay the like sum on 1st February, 1840; the like sum on the 1st March following; the like sum on the 1st April following; the like sum on the 1st May following, and the balance, $33,000, on the 1st June following, at the place

and in the manner stipulated for the payment of the first sum.

The complainant, after setting forth the above facts, alleges that the whole amount of moneys paid by Delafield under the two contracts up to the time of the filing of the bill on the tenth day of August, 1840, is only about the sum of $170,000, and no more; that he has utterly failed to comply with his engagements, and declares that he will not make any further payments under the contracts. The complainant then alleges, that on the first day of February, 1840, the legislature of the state of Illinois passed two acts, one abolishing the *Board of Fund Commissioners* of that state, and the other making provision for the appointment of *one fund commissioner*, whose duty, amongst other things, it should be to receive and take back any and all state bonds theretofore sold to any person, firm or corporation who had failed, or might thereafter fail to comply with their contracts; that in pursuance of such acts of the legislature, Richard F. Barrett, a citizen of Illinois, had been duly appointed fund commissioner of the state, who, on the fifteenth day of April, 1840, proceeded to the city of New-York, and entered into negotiations with Delafield to recover back the bonds or certificates of stock of the state, or to obtain security or indemnity for the same; but that the negotiation had wholly failed, except that Delafield had delivered to Barrett two drafts for about $20,000, each of which was then under protest; that an offer has been made to Delafield to refund to him all the moneys with the interest thereof which he has paid on the bonds or certificates of stocks received by him from the agents of the state, but that he has refused to accept such offer. The complainant avers that the whole of the transactions and negotiations of the agents of the state with Delafield were wrongful and illegal, inasmuch as the bonds or certificates of stock were sold *on credit*, and *for less than their par value;* and that, therefore, the agents of the state had acted *without authority;* and that the contracts entered into

1841. Delafield v. The State of Illinois.

by them are not obligatory upon the state. It is then alleged that the complainant is not fully informed as to the pecuniary circumstances of the defendant, but it is charged that his personal responsibility is wholly inadequate as security to the state of Illinois for indemnification or payment of the large demands of the state against him, on or by reason of the matters set forth in the bill, concluding with a prayer for relief and for an injunction. Application for the injunction was made upon the bill thus filed and upon various documents, comprising a portion of the correspondence between Barrett and Delafield.

The defendant appeared by counsel and opposed the issuing of the injunction. An affidavit made by him was read: in which, amongst other things, he deposed that the agents of the state of Illinois treated and considered the sales of the bonds *at par*, receiving a dollar of legal currency for every dollar of bonds sold, with a benefit to the state of Illinois of the exchange existing between Illinois and New-York, which at the time of making of the contracts was *five per cent* in favor of New-York; and that by making the payments at New-York or in New-York funds the state of Illinois could and would realize *more than par* for the bonds. He further deposed, that at the period of the contracts it would have been more advantageous for him to have allowed a regular interest account on the contracts, debiting himself with interest on the several installments from the date of the contracts, and have made his payments for the bonds in Illinois, inasmuch as the bank notes of the Bank of the State of Illinois, a state institution, part of the stock of which is owned by the state of Illinois, and then a specie-paying bank, could be and were purchased in the New-York market from 20th April, 1839, to June, 1840, at rates varying from five to sixteen per cent discount, but the commissioners considered the plan adopted by them to be more advantageous for the state of Illinois; and that the same was so in fact. That as he understands the matter, the usual and received construction of a sale *at par value* of

1841.

Delafield v. The State of Illinois.

public bonds relates to the *principal* of the bonds, and that the *interest* within the rates allowed by law is a matter of adjustment between the parties; that the average of the payments to be made by him was six months; that the bonds carried but six per cent interest, and consequently without taking into consideration the exchange before referred to, the state of Illinois would have lost but three per cent on the contracts; but that the exchange, which was five per cent in favor of New-York, where he was to make his payments, was taken into consideration, and it appearing to the commissioners that the state of Illinois would thereby receive a premium of two per cent over the *par* of the bonds, they had no hesitation, and expressed no doubt of the legality of the contracts; and he also believed them legal. That both the contracts were made by him in good faith; that Rawlings and Reynolds, the agents of the governor, with whom the contract was made for the purchase of the 300 bonds, apprised the governor of the completion of the contract, and requested him to prepare, sign and seal the 300 bonds, and transmit them for delivery to the defendant; that they were accordingly executed, transmitted to New-York and delivered to him on the 12th day of June, 1839. (Thus it seems, that although the bonds purport to have been executed previously, they, in fact, were not issued until subsequent to the making of the contract.) In relation to the contract for the 283 bonds, he says that it was transmitted by the commissioners to the governor of Illinois, about the 13th day of May, 1839, and was duly reported by the auditor of the state; that the moneys paid by him were received by the state of Illinois under the contracts, and applied to the use of the state. In justification or excuse of himself for not going on and performing his part of the contract, the defendant alleges that in the month of June, 1839, the state of Illinois placed bonds to the amount of $500,000 (besides those negotiated to him) in the hands of an agent for sale, contrary to assurances given him, the effect of which was to depreciate

1841. Delafield v. The State of Illinois.

all the stocks of the state, and to produce an immense loss to him; that in the early part of July, 1839, the stocks of Illinois were *at par*, and on the first day of August they were reduced to ninety, and continued to sink until they fell on the fourteenth day of January, 1840, to sixty-two. That he paid the instalments due from him in July and August, 1839; and that the subsequent instalments were postponed at the request of the Fund Commissioners of Illinois for four months, with a view to the payment of *dividends* upon the state stocks; that before the first day of January, 1840, it became known to him that proceedings were pending in the legislature of Illinois, having for their aim *the repudiation of the contracts* of the commissioners; and he had been advised that no provision had been made for the payment of the interest on the public debt of the state of Illinois; that in consequence of these and other facts, afterwards detailed, he refused to make further payments beyond the sum of $150,000, already paid by him. That an extra session of the legislature of Illinois, upon the call of the governor, was held, commencing on the tenth day of December, 1839, and on the twentieth of January, 1840, a resolution was adopted in the senate of that state by a vote of twenty-one to eighteen, *repudiating the contract* made with him in respect to the 283 state bonds; which resolution was subsequently repealed, but only by a vote of nineteen to eighteen. That in January, 1840, the *state of Illinois paid to him interest on the whole* 583 *bonds* then held by him, and he believes also paid the interest due at that time on those not held by him, to the respective holders thereof. That in February, 1840, the legislature of Illinois abolished the old board of fund commissioners, and passed an act authorizing the appointment of a sole fund commissioner; that Richard F. Barrett was accordingly appointed sole commissioner, to whom, since his appointment, he has paid $20,000 and upwards; and with whom he has had a protracted negotiation, the particulars of which he gives, in an attempt to effect a compromise with

the state of Illinois; but that the same has proved fruitless. That under all the circumstances, he considered further payments on his part, until the damage he had suffered was adjusted, as unadvisable and unjust to his own interest. That the refunding of the moneys advanced by him will not place him in *statu quo;* and that if the contracts must be rescinded, he claims an allowance of such damages as he can show he has sustained. In relation to the situation of the bonds, he says, that none of them are in his possession or under his control, they having all been *bona fide* disposed of by him, in the course of his business. The defendant also deposed (and in this his affidavit was corroborated by the affidavits of other bankers and financiers) that the usual and general practice in the sale of *public state stocks*, is to pay for them by instalments.

The Chancellor granted the *injunction* prayed for, and directed the appointment of a *receiver* of the bonds remaining in the possession of the defendant, and of the proceeds of such as had been sold by him. See the opinion of the Chancellor, 8 *Paige* 533, *et seq.* The defendant appealed from this decretal order.

To the due understanding of some of the points raised on the part of the appellant in this court, which were not urged in the court of chancery, it is necessary to state, that the bill filed in this cause commences in this form: "The State of Illinois, complaining, shows," &c. It is signed "RICHARD F. BARRETT, Fund Commissioner of the state of Illinois, by SAMUEL B. RUGGLES authorized by the power of attorney mentioned in the annexed affidavit." "SAMUEL B. RUGGLES, Solicitor for the complainant. WILLIAM KENT, of counsel." Then follows an affidavit of Mr. Ruggles, stating that a bill, substantially like the present had been filed on the 20th day of July, 1840, on the equity side of the circuit court of the United States for the southern district of New-York, which had been duly verified by Mr. Barrett; that such bill had been dismissed on the motion of the complainant in consequence of doubts as

1841. Delafield v. The State of Illinois.

to the jurisdiction of that court in the matter; that Mr. Barrett, being a resident of Illinois, had returned to that state, but before leaving New-York had executed a power of attorney, as Fund Commissioner of the State of Illinois, authorizing him to commence suits in any court for the bonds, certificates of stock, &c., demandable by the state of Illinois, and he then verifies the bill according to the best of his information and belief.

The cause was argued in this court by:

*E. S. Van Winkle* and *S. Stevens*, for the appellant.

*J. Howe* and *Willis Hall*, (Attorney General,) for the respondent.

*Points submitted and argued on the part of the appellant:*

I. The bill of complaint would be dismissed upon demurrer, therefore no order or decree founded upon it *against the defendant*, can be sustained.

1. The court of chancery of this state has no jurisdiction of the case presented by this bill. By the constitution of the United States, the supreme court of the United States has *original*, and as a necessary consequence, *exclusive* jurisdiction in all cases where a state is a party in a litigation with a citizen of another state, where the controversy does not arise under the constitution, laws or treaties of the United States. It necessarily follows that the state courts have no jurisdiction in such cases. *Art.* 3, § 2 *of the Constitution of the U. S., found in* 1 *R. S.* 14. *Marbury* v. *Madison*, 1 *Cranch* 174–5, 137. *Commonwealth* v. *Kosloff*, 5 *Serg & R.* 545. *Dunham* v. *Gordon*, *Coxe Dig.* 433. *Osborn* v. *The U. S. Bank*, 9 *Wheaton* 820.

2. A sovereign power or state cannot maintain a suit *in its political name*, in the court of chancery of this state. *The Columbian Government* v. *Rothschild*, 1 *Sim. R.* 94; 2 *Condensed Eng. Ch. Rep.* 48, 53, *S. C.*

3. The bill does not make out a case, either of exclusive or concurrent equitable jurisdiction. The complainant has an adequate remedy at law for the injury complained of. The appellant acquired a valid legal title to the bonds in question, by virtue of the contracts and the subsequent ratification of them by the respondent, and the payment to, and acceptance by the respondent, of a portion of the consideration agreed to be given for the bonds, in pursuance of the contracts. The defendant, therefore, simply held the relation of debtor to the respondent, for whatever balance might be due upon the contracts. The remedy of the complainant is complete by suit at law to recover such balance. The fact that the appellant is not of sufficient responsibility to meet any recovery that might be had at law, forms no ground for the interposition of a court of equity. But if, as is claimed by the bill, the contracts were void, so that the appellant acquired no title to the bonds, still the remedy of the respondent is complete at law. The value of the bonds, or the bonds themselves, at the election of the complainant, can be recovered of the appellant at law. The payment of the bonds can be justly and legally resisted by the respondent, whether they are in the hands of the appellant or third persons. No case of fraud is alleged or pretended, as the ground of a concurrent equitable jurisdiction.

II. The bill is not signed by the complainants, nor by any person authorized to bind them, nor filed by their authority. Any decree, therefore, which might be given upon this bill, would not be obligatory upon them, and would therefore be no protection to the appellant.

III. There is no legal proof or verification of the truth of the bill, as required by the practice of the court of chancery, to authorize the issuing of an injunction. *Jones* v. *McGill*, 1 *Bland's Rep*. 180.

IV. If all the foregoing positions should be held untenable, then it is submitted that the whole equity of the bill is disproved by the affidavit of the appellant.

1841.

Delafield
v.
The State of
Illinois.

*First.* The contracts are shewn to be valid. The Fund Commissioners were the general agents of the respondent for making sale of the bonds; they claimed to have authority to sell on the terms they did. Whether they had such authority or not, depended upon the construction of the statutes of the state of Illinois. After the contracts were made, they were approved by the governor and auditor, and the bonds in question were issued in fulfilment of the contracts on the part of the respondent. The appellant was fully justified in giving credence to the construction which those high functionaries put upon their own statutes. The state of Illinois has not only, by her legislative action, expressly refused to repudiate the contracts, but has ratified and confirmed them: by the acts of her governor, her fund commissioners, her auditor—by receiving payments upon the contract, and applying them to her own use—by the payment of the interest on the bonds, and by her legislative action; and she cannot now, in a *court of equity*, repudiate them if she would. Her only remedy, therefore, is upon the contracts, and she can no more resort to a court of equity to enforce payment upon them than she could to collect any other ordinary debt.

*Second.* The respondents violated the terms upon which the contracts were made, and thereby reduced the value of the bonds in the hands of the appellant greatly below the price which he had agreed to pay for them. Under such circumstances, the respondents have no *equitable claim* to any remedy or relief beyond what they can obtain at law.

*Third.* The appellant had disposed of all the bonds prior to the filing of the bill, and had none of them in his possession, or under his control. No injunction, therefore, restraining him from disposing of or parting with the bonds, could be necessary or available. The respondent was simply a creditor at large of the appellant, for whatever balance might be legally due from him for those bonds. Such creditor is not entitled to a receiver, or an injunction

to restrain his debtor from making disposition of his property.. *Higgins* v. *Armstrong*, 2 *Johns. Ch. R.* 144.

*Points submitted and argued on the part of the respondent:*

I. The contracts made with Delafield are illegal and void. 1st. The stock was sold *below* its *par value*, in direct violation of the statutes under which it was authorized to be issued; and 2d. The agents of the state were not authorized to sell the bonds or certificates of stock *upon credit*. The agents appointed by the governor, who made the first contract, and the fund commissionere who made the second contract, were not judicial officers, but mere agents of the state; and the statutes under which alone they could act were severally special powers of attorney, constituting such agents special agents of the state, and, as such, they were to be governed by their instructions and the usages of trade; and there is no distinction between the agent of a government and the agent of an individual. A person dealing with an agent with limited powers is bound to examine the authority of that agent. *Chitty on Contracts* 58. *Schimmelpennick* v. *Bayard*, 1 *Peters' S. C. Rep.* 264. 15 *East* 43. The agents of the state had no authority, except what was derived from the statutes of the state. The principal is not bound by the acts of the agent beyond his authority. *Story on Agency* 160, § 170. *Beals* v. *Allen*, 18 *Johns. R.* 363.

As to the sale being *below par:* 1st. The interest upon the bonds delivered under the first contract was to commence running from *their delivery;* and upon those delivered under the second contract, was to commence running from the *date of the contract;* while the payments for the bonds were to be made at stated times *without interest*—the first payment to be *fifteen days*, and the last *thirteen months*, after the delivery of the bonds to Delafield. The time of the payments thus to be made, being, upon the aggregate amount, about *three and a half months* upon the first contract, and about *ten months* upon the second contract, after

1841.
Delafield v. The State of Illinois.

the delivery of the bonds. 2d. The difference in exchange between New-York and Illinois cannot be taken into consideration, or set off against the loss of interest. The money was to be raised, and the interest paid, and principal to be reimbursed, at the same place. The rate of exchange between New-York and Illinois had nothing to do with the contracts. 3d. The state wished to borrow money, and it was only in furtherance of such wish that the legislature authorized a sale of the bonds; and the legislature intended that the bonds should only be sold by receiving *a dollar in money* for every dollar to become due and payable upon the bonds. 4th. Any part of a contract being contrary to statute, renders the whole contract void. *Chitty on Contracts*, 228, § 2. 1 *Chitty's Pl.* 323, *and cases cited. Crawford* v. *Morrell*, 8 *Johns. R.* 253.

As to the authority to sell the bonds *upon credit:* 1st. An agent, whether general or special, has no power to sell on credit, unless expressly authorized so to do, except in cases where the property which he is employed to sell is of that description which is usually sold on credit. *Smith's Merc. Law, 2d Lond. ed.* 87. 2d. It is not shewn that it was the usage of trade to sell stock on credit; and on the contrary, such was not the usage. *Wiltshire* v. *Sims*, 1 *Camp. Rep.* 258. *Story on Agency*, 74, § 78. 3d. The statutes of the state did not authorize the commissioners or agents to sell on credit; and such a sale was against the whole spirit of the laws of the state.

II. There has been no *ratification* of the contracts. 1st. A contract can be ratified only by one who had power originally to authorize the making of the contract. 2d. The state, by her legislative act, expressly prohibited the sale of bonds for less than their par value; and by the whole tenor and spirit of her acts, as well as by the custom of trade, which, being established, is the law, prohibited the sale on credit. Hence, nothing short of an act of her legislature, can validate a contract made in contravention of her statutes and the law. *The People* v. *The Phenix Bank*,

24 *Wend.* 431. 3d. The acts which are alleged as amounting to a ratification, are mostly acts of the very agents who made the contracts originally. 4th. The silence of the state through her legislature would be no ratification. The only way for her to repudiate the contracts was to come, as she has come, into a court of equity, for relief against the unauthorized and illegal acts of her agents. 5th. The contracts being unauthorized and illegal, any and every secondary contract, or *subsequent act*, is also unauthorized and illegal.

III. The state has no remedy except against Delafield. The bonds are instruments transferrable by delivery, and the state is bound in honor to pay them to a *bona fide* holder; a subsequent purchaser in good faith would not be required to know that their original transfer had been unauthorized or illegal.

The counsel for the appellant, in support of the proposition *that the court of chancery of this state has not jurisdiction of the case presented by this bill*, argued thus: The Constitution of the United States, *Art.* 3, § 1, 2, specifies two classes of cases, by which to determine the extent and nature of the jurisdiction of the supreme court of the United States. The first class is determined by the *nature of the case* and includes *all* cases arising under the constitution, laws and treaties of the United States. The second class is determined by the *character of the parties*, and embraces cases in which a state is a party, and her own citizens are not the defendants. *Bank of U. S.* v. *Deveaux*, 5 *Cranch* 85. *Martin* v. *Hunter's lessees*, 1 *Wheat.* 334. The present case is one in which a state is a party, and does not arise under the constitution, laws or treaties of the U. S. It therefore comes *exclusively* within these words in the constitution: "Controversies between a state and citizens of another state." Now, by the sub-section of the constitution above quoted, the supreme court of the United States is vested with *original* jurisdiction over

1841.

Delafield v. The State of Illinois.

such controversies. And all its original jurisdiction must be exclusive, because, the grant in the constitution of a judicial power is a specific and limited one, and cannot be enlarged by congress, or by implication. The supreme court cannot have original jurisdiction where the constitution gives it appellate jurisdiction, nor *vice versa* appellate jurisdiction where it has original jurisdiction. If then the supreme court cannot have *appellate* jurisdiction in a matter of *original* jurisdiction, how can a state court have *concurrent jurisdiction* in a matter pertaining to the *original* jurisdiction of the supreme court? For that the supreme court must have original or final jurisdiction in all the cases in which original jurisdiction is given, is too plain to admit of a question; and yet if the suit be commenced in a state court, what is the result? The inferior tribunals of the United States have no power in the case by the constitution, and the supreme court has no appellate jurisdiction. The federal courts may thus be completely ousted.

All the *original* jurisdiction became vested in the supreme court, by the creation of that court, and congress has no control over it. But in regard to the appellate jurisdiction, congress can vest it where it is thought proper, "with such exceptions and under such regulations as the congress shall make."

The section of the judiciary act of 1789, declaring that the jurisdiction of the supreme court in a case between a state and a citizen of another state, shall be original, but not exclusive, is therefore repugnant to the constitution and void.

Nor can a state make her election whether she will go into a state court or a federal court. The plaintiff cannot, by his volition, oust a jurisdiction invested by the constitution.

It is a contradiction of terms, to say that the supreme court shall have *original* jurisdiction in a case, and then to say that such jurisdiction may be concurrent in state courts,

while it is evident that the supreme court cannot exercise appellate jurisdiction. The federal jurisdiction is thus effectually ousted.

The defendant is not bound to show a reason why a state court should not have jurisdiction. It is enough that the constitution denies it.

The view maintained by the appellant is consonant to the constitution, and affords a safe guide and harmonious construction of that instrument; and is free from the difficulties that must attend any other construction. *Marbury* v. *Madison*, 1 *Cranch* 174–5. *Commonwealth* v. *Kosloff*, 5 *Serg. & R.* 545. *Dunham* v. *Gordon*, *Coxe Dig.* 433. *Osborn* v. *The U. S. Bank*, 9 *Wheat.* 820. *U. S.* v. *Ortega*, 11 *Wheaton* 468: 1 *Kent's Comm.* 1 *ed.* 378. *U. S.* v. *Deveaux*, 5 *Cranch* 87. *Martin* v. *Hunter's lessees*, 1 *Wheat.* 334—337. *Cohens* v. *Virginia*, 6 *Wheat.* 264, 392—399: *Federalist* 81, 82: 1 *Kent's Comm.* 3*d ed.* 314, 315, 396, 403; 3 *Story's Comm.* 575, § 1699: *Id.* §§ 742, 743, 744, 745: 1 *Wheat.* 348, 349, 304.

After advisement, opinions were delivered by Mr. *Justice* Bronson, and by *Senator* Verplanck. The opinion of the former will be found in 2 *Hill* 161, *et sequitur;* the opinion of the latter is as follows:

By *Senator* Verplanck. Several questions, wholly distinct from each other, and all of very great importance, have presented themselves on the argument and examination of this cause.

I. Has any court of a state of this union jurisdiction of a cause like this between one of her own citizens and another state?

The constitution of the United States has declared, that the "judicial power of the United States shall extend to all controversies between a state and citizens of another state;" and has farther provided, that "in all cases in which a state shall be a party, the supreme court shall have

1841.

Delafield v. The State of Illinois.

original jurisdiction." Do or do not these words vest the whole and exclusive jurisdiction of such cases in the supreme court of the United States, without leaving a concurrent jurisdiction in the state courts at the option of the plaintiff state?

It was the avowed intent and plan of our federal constitution to preserve the state sovereignties unimpaired, except so far as the concession of certain specific powers was necessary to the creation of the federative government and the due exercise of its authority. It was accordingly held from the very origin of our present form of government, that the several states must retain all those rights of sovereignty which they or any of them had before the adoption of the United States constitution, or which were not by that constitution *exclusively* delegated to the union. To use the language of Chief Justice Marshall, "The powers of the states remained, after the adoption of the constitution, except so far as abridged by that instrument. Mere grants of power to congress do not imply a prohibition to the states, to exercise the same power," *Sturges* v. *Crowninshield*, 4 *Wheaton*, *R.* 193. A general rule of construction founded upon this principle, was laid down by the great cotemporaneous expounders and defenders of the constitution, in the "*The Federalist.*" This has since been repeatedly cited by Marshall and has been employed as the foundation and authority for many decisions in the courts of this state, and of the United States; so that it may be now regarded as having become an authoritative canon of constitutional interpretation. *Federalist No.* 33. 4 *Wheat. R.* 193, 5 *Id.* 1. 9 *Johns. R.* 507. The abrogation of state authority, it was there said, results only in three cases: where the constitution in express terms grants an exclusive authority to the union; where it grants an authority to the union, and in another instance prohibits the states from exercising the like authority; and where it grants an authority to the union, to which a similar authority in the states would be absolutely and

totally contradictory and repugnant. In applying this rule of construction, the supreme court of the United States, which has never shrunk from asserting the direct powers of the general government, has yet refrained from denying to the states any power attendant on sovereignty, which did not come into direct and immediate collision with the federal legislation. They have held that even where the constitution expressly delegated powers to the union, such as the state had previously possessed, these powers, if not prohibited to the states by the constitution, still remain subordinate to the paramount power of congress acting upon the same subject. When that power is exercised, the authority of the states to exercise the same is at an end. But so long as it remains dormant; or, if in partially exercising it, an express permission be given by congress to the states, they might continue to exercise a concurrent authority. "It is not," said Chief Justice Marshall, "the existence of the power, but its exercise, which is inconsistent with the exercise of the same power in the states." See his opinion in *Sturges* v. *Crowninshield*, 4 *Wheat. R.* 193, and those of Judges Washington and Story, in *Houston* v. *Moore*, 5 *Wheat. R.* 5. Also the perspicuous summary of the whole doctrine and argument of the concurrent powers of the union and the states in the 18th lecture of *Kent's Commentaries*. These principles and rules of construction were laid down by these high authorities, primarily in respect to the conflicting powers of congress, and the state legislature; but they are equally applicable as to their reasons (as many of the authorities are in their express language) to any other apparent contest or division of power between the state authorities, and any branch of the general government, or any of the laws framed to carry its powers into effect. They have therefore been cited and argued from, by distinguished statemen, lawyers, judges and commentators, in discussing the various questions that have arisen, touching the judicial cognizance of the state courts, and those created by or under the consti-

1841. Delafield v. The State of Illinois.

tution of the United States. Let us, then, apply these principles of constitutional construction to the question before us.

Irrespectively of the United States Constitution, each of the several states had and still has an undoubted original right to submit any controversy she may have with a private citizen, residing out of her own jurisdiction, to the established tribunals of justice of his own domicil. It is the natural right of every sovereign, recognized as such both by positive law and by the usage and comity of nations, to waive his sovereignty, and prosecute his claims against any private citizen or subject, upon the plain grounds of justice or equity—demanding their enforcement from those tribunals to which that citizen or subject is ordinarily amenable. On the other hand, as it is the primal duty of every sovereign state to distribute equal justice and enforce the discharge of the obligations of its citizens towards each other, it is equally so in regard to the obligations of those citizens towards foreigners. Such a duty involves and implies the right of entertaining jurisdiction whenever another state appears, not as a sovereign, but as a mere foreign corporation, coming as a voluntary party into its courts of justice. Thus previously to the constitution, and independently of it, are rights on both sides. There is the right of one state to prosecute its private claims and protect its pecuniary interests by a voluntary submission to the jurisdiction of the tribunals of another sovereignty. This is simply the right of one state to select the judges of another state in a controversy with one of their fellow citizens, as the arbitrators of the dispute to be decided according to their own laws. There is also the right, founded on its duty of administering justice, of every state to take jurisdiction and pass upon such a controversy. Such rights and duties can be denied by no civilized community which does not adopt Chinese notions of international intercourse, and regard all other people as "outside Barbarians." How far, then, does the constitu-

1841.

Delafield v. The State of Illinois.

tion abridge either of these state rights—the right to appear as a suitor or the right to recognize a sovereign state as a suitor in the courts? There are certainly no express prohibitions in unequivocal words, either on the several states to submit their controversies with the citizens resident in other states to the jurisdiction of any court to whose jurisdiction they may be ordinarily amenable. There is no express inhibition to the state courts to take cognizance of such a suit or controversy. There are no express terms vesting exclusive jurisdiction in the supreme court of the United States. The word *exclusive*, which would most naturally suggest itself, either in ordinary or in technical use, is not employed, nor is there any equivalent phrase added to the words "original jurisdiction." There are no negative words. It is not even said that in such cases "the supreme court shall have *the* original jurisdiction." It is merely that the court "shall have original jurisdiction." The bare grant of original jurisdiction to the supreme court in certain cases, does not in the ordinary use of legal or legislative language imply an exclusive jurisdiction. Our statute book affords abundant evidence to the contrary; and some similar use of language may be found, I presume, in the statutes of most of the states. Thus in our Revised Statutes, 2 *R. S.* 208, jurisdiction is given to the courts of common pleas in each county "to try and determine all local actions within the several counties." But the Revised Statutes have also given the same power in all the counties to the supreme court. Yet the act of 1828, has conferred upon the superior court of the city of New-York an original jurisdiction which no one has ever supposed to interfere with either of the others. It is empowered "to hear, try, and determine all local actions arising in the city of New-York." Here are three distinct grants of original jurisdiction within the city and county of New-York, yet none of these after many years' experience, were ever maintained to be "an exclusive jurisdiction" or even "the original jurisdiction."

1841.

Delafield v. The State of Illinois.

Neither is there any thing in the nature of the power granted, necessarily exclusive. The convention had good reason in forming the constitution to protect the rights and interests of the weaker states against possible frauds or injury of any citizen of other states of the confederation, who might be protected by popularity, or influence, or prejudice, or the partial laws of his own domicil. They did this effectually by erecting a common tribunal of the Union, where such influence, or prejudice, or partial laws would be powerless. But there is no apparent reason why, when no such danger exists, any state should be inhibited from choosing its own forum for the decision of its private controversies, or any other state prevented from opening its courts to adjudicate upon a state litigation thus freely submitted to them. Those permanent and general laws of each state which protect every citizen from wrong or injury from his neighbor, must be always as sure a safeguard in his own courts against the claims of a neighboring commonwealth, as he could find in the courts of the Union. There is no necessary collision between the two jurisdictions. There is no reason why both the courts of the states and United States should not exercise concurrent jurisdiction, any more than there is to deny jurisdiction to our local courts concurrent to the supreme court of the state.

We may safely apply to this question the language of an eminent judge, little inclined to the extension of state authority at the expense of the federal judiciary, and say with him, "This power originally existed in the states, and the grant of it to the United States was not necessarily exclusive, unless a concurrent power would be repugnant to the grant, and here is no repugnance in the nature of the power." 5 *Wheat. R.* 5, *per Story J.*

The judges of the supreme court of the United States have, indeed, on some analogous questions, expressed opinions, such as by inference or implication seem to deny the constitutional right of any concurrent jurisdiction. *Mar-*

1841.

Delafield v. The State of Illinois.

*bury* v. *Madison*, 1 *Cranch R.* 137. But that court has never thus *decided;* and mere inferences from general assertions in the course of arguments directed to other ends, must be taken with great allowance. If this remark needed the support of authority, I might cite the observations of Chief Justice Marshall on this very point. Besides this, congress has by the constitution, " power to make all laws necessary and proper to carry into effect all powers vested by the constitution in the government of the United States or in any department thereof." Hence congress has derived the authority exercised in passing the laws erecting and regulating the "Judiciary power." If, then, in the judgment of congress, it was necessary and proper for carrying out the original jurisdiction of the supreme court, to declare that power exclusive of all state jurisdiction, I presume that it was competent for congress thus to enact. But congress judged otherwise. In the act of 1789, " to establish the Judicial Courts of the United States," better known under the title of " the Judiciary Act," it is enacted as follows: " § 13. The Supreme Court shall have exclusive jurisdiction of all controversies of a civil nature where a state is a party, except between a state and its citizens, and except also between a state and citizens of other states or aliens, in which latter case it shall have *original but not exclusive jurisdiction.*" This is not a transient or accidental expression as to *exclusive* jurisdiction, for throughout the act, and especially in this very section, the line between jurisdiction conferred "exclusively" or as "not exclusive," is clearly and unequivocally marked. This provision of the judiciary act may be regarded in two distinct aspects. It is first, an express legislative declaration of congress that the general government does not exercise its whole power on this subject, and therefore, as in other matters, means to leave the concurrent power undisturbed, or as held by our own court in former years, " that this exercise of power does not come practically into collision with the exercise of the power of the United States, and that therefore

1841.

Delafield v. The State of Illinois.

the state authority remains good as not contravening the provisions of the paramount law." See the opinion of Judge Washington as to the militia laws, in *Thurston* v. *More*, 5 *Wheat. R.* 5, and that of Kent, Chief Justice, in *Livingston* v. *Van Ingen*, in this court, 9 *Johns. R.* 576. The authority last cited does not lose its weight as to the rule of constitutional law from the reversal at Washington of the decision to which it led; since that reversal went not on the denial of the principle asserted, but upon the ground that the state legislation did, impliedly at least, contravene the provisions of the paramount law. But here the judiciary act in the name of the general government, expressly permits that exercise of state jurisdiction as being valid before the act and not now prohibited.

Still the objection to the jurisdiction goes deeper. It denies the constitutionality of this provision of the judiciary act. It must then be remarked that this act has in addition to the ordinary authority of an act of congress, that of being a cotemporaneons exposition of the constitution. It was reported, by Oliver Ellsworth, afterwards Chief Justice of the United States, and enacted by a congress filled with the framers of the constitution. This is not decisive against the possibility of some accidental oversight of a provision hostile to the letter or spirit of the constitution, (since the supreme court has otherwise decided in respect to another clause of this same act,) but it furnishes the very highest presumptive evidence and authority as to the true meaning of the constitution. It shows indisputably, as to the judicial power, what Judge Washington observed as to the militia power, "that in the opinion of congress, a grant of jurisdiction generally, is not in itself sufficient to vest an *exclusive jurisdiction.*" 5 *Wheat. R.* 5. Under this view of the intent and meaning of the constitution, I am decidedly of opinion that our state courts have a concurrent jurisdiction with the supreme court of the United States, over controversies where another state is a party. If I doubted upon the reason of

the matter, and the interpretation of the constitution itself, I should yet think that the authority of the venerable and almost cotemporaneous judiciary act, the long and unquestioned exercise of the authority in this and other states, whenever needed, together with the strong analogy of other decisions, should induce us to acquiesce in the law and usage until the ultimate constitutional tribunal shall pronounce the unconstitutionality of the provisions of the judiciary act, declaring the jurisdiction of the supreme court to be original "but not exclusive." I hold with Judge Washington, (4 *Dallas R.* 14,) that "the presumption must always be in favor of the validity of any law, if the contrary is not clearly demonstrated," and that therefore our court should say with the supreme court of the United States, in *Fletcher* v. *Peck*, 6 *Cranch R.* 87: "This court will not declare a law of the United States to be unconstitutional, unless the opposition between the constitution and the law be plain and clear."

II. It is next argued that, conceding that the jurisdiction is not exclusively in the court at Washington, still the complainant does not make out a case authorizing the interposition of Chancery. This objection seems to me to rest chiefly upon the character of the state securities in the hands of the appellant. If these are mere bonds subject, like other specialties of individuals in the hands of the assignees to all the equities between the original parties, then it might be sufficient to reject the contract and refuse payment beyond the amount actually received, whilst the state might recover the value of the bonds, or the amount of the contract against Delafield, if the bonds themselves cannot be reached. Thus there would be no necessity for the interference of the power of equity, since the state could not be remediless at common law. But the *bonds* in question, though so termed in the statute and in the bill, as well as in the correspondence which forms part of the case, are not bonds in the ordinary acceptation of the term. Mere bonds, made payable to bearer, though anomalous in

1841.

Delafield v. The State of Illinois.

the law, would fall within the constitutional inhibition upon the states to issue *bills of credit.* They would come within the definition of the supreme court of the United States (*Briscoe* v. *Bank of Kentucky*, 11 *Peters R.* 257) as "paper issued by the authority of a state on its faith, and designed to circulate as money." These bonds are not such, nor are they mere specialties with or without condition. They are simply *transferrable certificates of stock;* they are on their face respectively "Certificates of Illinois Internal Improvement Stock," and of "Illinois and Michigan Canal Stock." They correspond with the definition given judicially by the United States supreme court, in *Craig* v. *Bank of Missouri*, 4 *Peters R.* 419, being "instruments issued by or in behalf of a state, binding it to pay money at a future day for services actually rendered, or for money borrowed." The governor in one act, and the fund commissioners in the other, are authorized to borrow the money, and to issue the bonds or certificates. The authority to borrow, to issue certificates, and to sell them, necessarily involves, unless so far as positively restricted, all "medium powers" for that object. I adopt the convenient and expressive phrase of the clear-headed Chief Justice Eyre, and cite his authority, 2 *H. Blackstone, R.* 618, "By medium powers, I mean all those necessary to be used in order to obtain the accomplishment of the principal end;" which in this case is the borrowing of money at its par value upon state security, and the pledge of the public works and lands. In the exercise of this ordinary discretion these certificates are made out thus: "Know all men, &c. that there is due from the state of Illinois to A B, or bearer." This is simply the requiring possession and presentation of the certificate as the sole evidence of the right to receive the interest according to the terms of the loan, and the principal when due. Similar certificates of stock or funded debt may be issued by incorporated companies or cities, or by our banking associations in this state, like these in all respects except so far as they may

be positively restricted by law to a more formal mode of transfer. Thus, in our general banking law, these certificates are "transferrable only on the books of the association;" but otherwise "in such manner as may be agreed on in the articles of association." Such a contract then would be legally binding on the state if it could be reached by legal judgment. They are, therefore, binding to the full amount of the certificates upon the state in faith and honor, whenever they are presented by a *bona fide* holder, whatever may be the original equities between the State and Delafield. The case of *Kortright* v. *The Commercial Bank*, where the decision of our supreme court was affirmed in this court, 22 *Wend. R.* 354, places in a strong light the effect of the transferrable character of stock certificates in conveying to the *bona fide* holders all the original rights of the contract, unincumbered by unknown equities affecting the party to whom they were originally issued.

If the state can show that these certificates were illegaly, inequitably, or fraudulently obtained, it will follow that the only measure for the effectual protection of its interests, consistent with its faith and honor, is to anticipate the possession of these certificates by honest holders by obtaining what a court of equity can alone grant, an injunction to restrain their sale, transfer or hypothecation. *Delafield's* letters and admissions indicate that a part at least of the bonds were in his possession or under his control when the demand for them was formally made on the part of the State, and the contract rescinded. He now indeed, states that "none of them are now in his possession, or under his control, having been *bona fide* disposed of in the course of his business." Though this may be literally true, yet it does not deny that the bonds may have been hypothecated by him, or, as suggested to be the case, are in the hands of his assignees, for the benefit of prior creditors, and remain subject to all rights, claims and equities against him. If those certificates are not equitably

1841.

Delafield v. The State of Illinois.

his, then the restraining him or his representatives from farther transfer of the certificates, and the appointment of a receiver of their proceeds or avails is the only effectual redress. This is clearly within the most usual and beneficial operation of equity powers. It is in conformity to the rule stated by Mitford, "That the jurisdiction of a court of equity will be exercised when the principles of law by which the courts of law are governed would give a right, but the power of these courts are not sufficient to afford a competent remedy, or the modes of proceeding are inadequate to the purpose." *Mitford Ch. p.* 18. The present case is similar in principle to a decision of Lord Eldon in *Hood* v. *Aston and others*, 1 *Russell*, *R.* 412. There the Chancellor granted an injunction, to restrain Hall and others from negotiating a bill of exchange held by them, and accepted by Aston, in their partnership name for his individual debt. "The bill of exchange," said Lord Eldon, "if it passed by negotiation into the hands of a third person, who had no notice of the circumstances under which it came into the possession of the bankers, would be as good a bill of exchange as any one could desire to have; and from that danger and the mischief attending it, the plaintiffs have a right to be protected." Thus it is here; it is precisely because the transferrable certificates of state indebtedness are valid and binding on the faith of the State, in the hands of subsequent *bona fide* holders, and would be legally binding if they were the certificates of a municipal corporation, as of New-York or Albany, instead of those of a sovereign state, and it is only because they are thus binding, that the state of Illinois has invoked the aid of chancery, and has a just claim to that aid, and "a right to be protected from that danger and mischief." To the authority of this greatest equity lawyer of our times, I add, that of our own supreme court of the United States, speaking through Chief Justice Marshall: "We think this a case in which a court of equity ought to interpose, and that there are several grounds on which its jurisdiction

may be placed. One which appears to be ample for the purpose, is that a court will *always* interpose, to prevent the transfer of a specific article, which, if transferred, will be lost to the owner. Thus the holder of negotiable securities, indorsed in the usual manner, if he has acquired them fraudulently, will be enjoined from negotiating them: because, if negotiated, the maker or endorser must pay them. Thus, too, a transfer of stock will be restrained in favor of a person having the real property in the article. In these cases the injured party could have his remedy at law; and the probability that the remedy would be adequate is stronger in the cases put in the books than in this, where the sum is greatly beyond the capacity of an ordinary agent to pay. It is the province of a court of equity in such cases, to arrest the injury and prevent the wrong." *Osborn* v. *U. S. Bank*, 9 *Wh. R.* 845.

III. The objection to the suit being maintained by the State in its political name, with others, to the precise name used to the authority for filing the bill, all might or might not have had weight, if originally taken before the Chancellor, where any defects of form could have been remedied by amendment, and that of proof of authority by the necessary evidence or documents. But they are now presented for the first time, too late, and are too purely formal to be allowed to present any impediment to the administration of substantial justice between the parties after appeal.

IV. The legal character and validity of the contract between *Delafield* and the agents of the State are next to be considered.

It is a universal rule, that in order to bind the principal upon a contract made by an agent, the contract must be within the authority committed to that agent, and that the authority must be strictly followed. If the agent's acts vary substantially from his authority in nature or extent, or degree, they are void as to the principal, and do not bind him. *Comyn's Digest, tit. Attorney, C.* 11, 15.

1841.

Delafield v. The State of Illinois.

*Story on Agency*, § 165, 170. There is another rule founded on obvious reason and often applied: that when the agency is created or conferred by a written instrument, and grows wholly out of it, the nature and extent of the authority must be ascertained from the instrument itself, and cannot be varied or enlarged by usage. The courts have wisely given liberal constructions to the powers of agents authorized to deal generally in commercial matters as factors or brokers, or in any way held out to the world as having an unqualified authority to act for their principal in all matters coming within the range of their employment. But they have never questioned the strict application of the rule where the agent is employed specially for any particular transaction. There, if the agent exceed his special and limited authority, "the principal," according to Judge Story, "is not bound by his acts, but they become mere nullities so far as he is concerned." This is particularly applicable where the agency is created by a written instrument, or authority known to the party dealing with the agent as the source of his authority, and directing and regulating its object, extent and exercise. Thus in *Gardner* v. *Bailie*, 6 *T. R.* 591, a case decided by the king's bench after consulting with the judges of the common pleas, and in *Hogg* v. *Smith*, 1 *Taunt. R.* 349, it was decided that written instruments, setting forth the power, must be strictly pursued, and cannot be enlarged by evidence of usage. Such is peculiarly the case here. The whole authority of the public officers who negotiated the loans is created, controlled and regulated by several public acts of the state of Illinois, which formed the basis of the negotiation.

In our own court of chancery, in the case of a purchase from an officer specially authorized to sell certain lands by statute, it was held by Chancellor Kent, that "a special authority must be strictly pursued, and the purchaser is presumed to know that special authority, for it is contained in the act, and if he purchases in cases in which that special authority was not pursued, he purchases at his peril."

*Denning* v. *Smith*, 2 *Johns. Ch. R.* 244. How much more strongly does this hold, where the knowledge of the statute is not merely presumed, but proved and admitted.

The state of Illinois contends that the express and limited authority vested in her commissioners, has been transcended by her official agents in two respects: 1st. That when authority was given merely to sell the "bonds or certificates," they were *sold upon credit.* 2d. That the stock was sold *below its par value;* which was an express and absolute limitation or condition of the right to sell at all. This condition, it is contended, was violated or evaded by delivering the bonds to Delafield, with an immediate commencement of the running of interest, whilst the money was to be paid by instalments, giving him the advantage of an average gain of interest for one hundred and three days in the one contract, and ten months on the other. With respect to the first point of deviation from the limited power, it is certain that the courts have often held, in commercial cases, that the authority to sell does not authorize a sale on credit, unless it be a known usage of trade that such articles should be so sold. This is the natural suggestion of common sense; for to sell, is one thing, to give credit, another, and the power to do the one does not of course imply the other, unless commercial custom has given such an understanding as to some specific trade. This is not the ordinary usage of stock sales, and it has been accordingly held by Lord Ellenborough, in England, (1 *Campbell, N. P. R.* 258,) and by Judge Story, (on *Agency* 78,) that "authority to sell stock does not authorize a sale on credit," and that the owner of stock is not bound by a contract of his agent employed to sell who had sold even on a short credit. This is in close analogy with other decisions, such as that in *Gueriro* v. *Peck et al.*, 3 *Barn. & Ald.* 616, where it was held, that where a factor had authority to sell goods, his contract to barter them, though according to the known usage of the place, and with a person ignorant of his limited powers and instruc-

1841.
Delafield v. The State of Illinois.

tions, did not bind the principal. This is strong evidence of the commercial and legal understanding of the power to sell. But it is not necessary to rely upon legal or commercial usage or authority on this head, for I conceive that the acts of Illinois, under which this negotiation was made, clearly negative the idea of a sale upon credit. These laws first provide for a loan upon the credit of the state for certain purposes of internal improvement. Money is directed to be borrowed, and next it is added, that "it shall be deemed a good execution of the power to borrow, to sell the bonds authorized to be made," or in the other act, "to cause the said certificates of stock and state bonds to be sold." We must take the two directions together. Money is to be borrowed, and as the means of borrowing, certificates of stock may be sold. Thus, though a contract to advance the sums borrowed, not at once, but by instalments, would be valid; yet, as the sale of certificates is but another form of borrowing as "a good execution of a power," that borrowing, it seems to me, could only be effected by a cash sale, though the certificates might be delivered and the money paid for them from time to time. Still farther: The giving a credit involves a serious risk of loss. It is a hazard of loss, always possible, and which the event has shewn, was here probable. We cannot, therefore, on mere presumption, assume that such a risk was intended to be allowed to be taken by the official agents. The presumption, in the absence of any express words, is directly the reverse. If this transgression of the delegated power to borrow money and to sell stock, be doubtful, which I think it is not, the other deviation from this express limitation of the law is still more certain.

It is enacted that sales of the certificates may be made, "Provided that said stock and bonds shall not in any event be sold for less than *par value*." "*Par value*," in its customary and commercial sense, with reference to exchange between different states or countries, has been well defined to be "the equivalency of a certain amount of the currency

1841.

Delafield v. The State of Illinois.

of one country in the currency of the other." But in this sale there is no room for the comparison of the currency of Illinois with any other. The sale is of a certificate of stock, the interest of which is made payable at New-York or Philadelphia, at the option of the holder, and the principal at the expiration of a term of years, at either of those cities, at the option of the state. The curreney then, is that of New-York until the period for the redemption of the principal arrives, in or after 1860 and 1870, when in all human probability there will be little difference between that of Philadelphia and New-York. At all events, it cannot be now a matter of calculation; and if the payment be now made to the state in New-York funds, the *par* value would, in the common language of the stock market, as well as the natural interpretation of the phrase, independently of usage, be the amount due on the face of the certificate. But the actual sale is made on terms which, on the $300,000 sale, gave the appellant an advantage of one hundred and three days interest, and on the $283,000 sale of above ten months. I cannot, upon any understanding of the words, consider this a sale at par value, any more than if there had been an undisguised discount at the same rate. The rate of exchange between New-York and Illinois, seems to me to have nothing to do with the matter. Still less has the price at which notes of Illinois banks were selling in the city of New-York; for that discount might have been affected by doubts as to the solvency of those banks, or of their continuance of specie payments, or by the want of any regular agency where small sums might be redeemed. In giving these double advantages of credit and of gain of interest to Delafield, I conceive that the agents exceeded their specific and limited authority, and in the latter case assumed a risk far beyond the bounds of ordinary prudence, since it was done on the personal credit of the purchaser alone, unaccompanied by any security.

V. The only remaining inquiry is, whether any subsequent act, acquiescence, or neglect of the state of Illinois,

1841.

Delafield v. The State of Illinois.

has ratified the contract made in her name. It is a maxim of general jurisprudence, familiar to the civil law, and long ago incorporated into our own system, that "a ratification is equivalent to an express authority," or in other words, that when the principal upon a full knowledge of all the circumstances of the case, deliberately ratifies the acts or contracts of an agent who has exceeded his lawful authority or usurped an unauthorized agency, the principal will be bound thereby as fully as if the agent had been expressly empowered for such purposes. "In all such cases," says Chief Justice Best, "a subsequent sanction is considered the same in effect as an assent at the time." *McLean* v. *Drew*, 4 *Bingh. R.* 722.

The principle of such ratification is clear and unquestioned, but the nature and effect of the evidence required, when there has been no formal written or verbal acknowledgment is less obvious and has occasioned doubt in the courts, according to the varied circumstances of different cases. It has been held, in sound reason, that it is not absolutely necessary that there should be any positive and direct sanction, but that a legitimate presumption of assent will arise from any act or conduct of the principal inconsistent with any other supposition than a previous authority or subsequent assent. The principal who with full knowledge, receives the goods bought by his factor who transgresses his limits; or who sells them on his own account; the corporation for which money has been borrowed without authority, but which pays interest and passes accounts on the debt, have, (with others falling under the same rule) been held to have ratified the unauthorized acts of their agents. *Clarke's Ex. v. Van Remsdyck*, 9 *Cranch R.* 153. *Wilkins* v. *Hollingworth*, 6 *Wheat. R.* 241. *Ep. Soc.* v. *Epis. Church*, 1 *Pick. R.* 372. So long acquiescence in an assumed or abused agency or in any of its results, without positive acts of any sort, but with knowledge of the facts brought home to the principal, has also been considered equivalent to an absolute ratification. *Prescott* v.

1841.

Delafield v. The State of Illinois.

*Flynn*, 9 *Bingh. R.* 19. Upon such grounds and authorities as these, it was argued that the authority of the fund commissioners to make this contract, depended upon the construction of the several statutes of Illinois; that after the contracts were made, they were approved by the governor and auditor of that state, the appropriate executive officers, and the certificates were duly authenticated and issued; that the state has not only acquiesced in the contracts, but has refused to pass a vote repudiating them; that she has given the adjudicated evidence of assent, by receiving payment upon account of the contract and by payment of interest. It is here alone that I have had serious doubts as to this cause. But it must be observed that these rules, decisions and authorities concerning assent or ratification, as implied by acts or acquiescence, are no more than so many applications of the rules of presumptive evidence to an unknown fact.

Acts or acquiescence do not, as is sometimes carelessly said, ratify the unauthorized contract, but in the more guarded and philosophical language of the better authorities, they authorize judges and juries to *presume* consent or ratification. Certain conduct, according to the usual experience of human nature, or of business, ordinarily accompanies or indicates consent or approval. They are in judicial language, "inconsistent with any other supposition," and thus "the presumption may become violent and even conclusive." Now that conduct which in a merchant or other individual who is cognizant of his own affairs, and able to interfere at any time in disavowing the abuse of his confidence, would indicate that he did not thus disavow or disapprove his agent's conduct, is not significant in the same manner of the will of a sovereign government, which must act according to its constitution and laws, whilst the people can know the acts of its agents only through its representatives. It was well replied by the attorney-general to this part of the argument, that all the state officers together, including the governor, the auditor and the fund

1841. Delafield v. The State of Illinois.

commissioners, could not legally make such a contract as this; and therefore they could not ratify it directly, much less indirectly by acts signifying acquiescence. The legislature, in its sovereign capacity, acted as soon as it met, and it was convened specially before the usual time for this purpose. The expression of opinion on the legality of the contract, by report or resolution, was not necessary to show non-acquiescence, and the refusal or neglect of the senate to pass certain resolutions on the matter, would by no means be conclusive of approbation, standing alone. Had the session passed off thus, without further action, acquiescence or approbation might perhaps be inferred. But we find that on the first February, 1840, an act was passed repealing the law creating the offices of the agents who negotiated the loan; and another to appoint a single fund commissioner instead, who is "authorized and empowered to take and receive back all state bonds heretofore sold to any person, firm or corporation who has failed, or may hereafter fail to comply with the contract." The officer was immediately appointed, who soon repaired to New-York on this business, and commenced his demands upon the appellant, and the negotiation with him to settle the controversy. The delay of a few months, which in a private citizen might either indicate approbation, or hold out his agent to others as vested with full powers, has none of that weight of presumption in regard to the people of a whole state. If the state acted on the subject at the next session, and that session specially called out of order; if it acted in the manner deemed most prudent in order to rescind the contract and prevent loss, whilst it avoided any unqualified disclaimer of the debt in honest hands, this is all that could be expected, and all that could well have been done, consistently with a just regard to the honor and faith of the state.

There being then no ratification by the sovereign power alone competent to make it, I think that the decree of the Chancellor must be affirmed.

On the question being put, *Shall this decree be reversed ?* all the members of the court present, who had heard the argument, voted in the *negative* except *Senators* HAWKINS and PECK, who voted in the *affirmative*.

Whereupon the decree of the Chancellor was AFFIRMED.