Richardson *v.* Crandall.

larger accommodations, and a larger clerical force, would be required.　I do not understand that there is any serious difficulty in procuring larger accommodations, and more clerical force, if that should be found necessary.　But this is a mere anticipated difficulty, which I apprehend will not practically occur.　If it should occur, I see no difficulty in providing means to remove it.

Of course the street commissioner has the right and power to prescribe reasonable general rules as to the hours during which citizens may inspect the records of his office, and also such reasonable general rules as shall be necessary to preserve the records from loss or mutilation.

A mandamus must issue.

[NEW YORK SPECIAL TERM, November 5, 1866.　*Geo. G. Barnard,* Justice.]

## RICHARDSON *vs.* CRANDALL.

A provost marshal could not, under the act of congress entitled "An act for enrolling and calling out the national forces, and for other purposes," passed March 3, 1863, exact of drafted men, volunteers, or those offering substitutes, the deposit of money or property to be forfeited to the government if such drafted men, volunteers or substitutes did not report themselves at the proper rendezvous.

Such a power could not be conferred upon a provost marshal by either the war department or the provost marshal general; nor could either adopt, and by adoption ratify and make valid, a pledge exacted by a provost marshal for such a purpose.

Congress, only, could confer such a power, or adopt and ratify such a pledge when taken without its authority.

A public officer who acts without authority, or exceeds his authority, is liable as is a private agent, on the contract made, or for the act done without or in excess of his authority.　And the ratification by the principal will not relieve him from such liability to the injured party.

When, therefore, such an agent exacts a pledge of property without authority of the government, and an action is brought by the pledgor, to recover it back, while it is in the possession of such agent, he is liable for such property; and even the adoption of the act by the principal will not shield him from liability.

Richardson *v.* Crandall.

THIS action was brought to recover the possession of twenty-two Oneida County War Loan Bonds, for the sum, amounting in all, of principal, to $20,000, besides interest.

The cause was brought to trial at the Oneida circuit, in November, 1865; and a jury trial having been waived by the respective parties, the same was tried before Hon. Wm. J. BACON, justice, presiding, when the plaintiff produced and offered in evidence the following stipulation, signed by the attorneys of the respective parties, viz :

"It is hereby stipulated by and between the respective parties, that the following facts are admitted on the trial of this action, as the facts of the case. 1st. That on or about the 30th day of January, 1865, Aaron Richardson, assignor of the plaintiff, was the owner and possessor of all and sin- gular, the several bonds set forth and described in the com-. plaint in this action, being twenty-two in number, and in amount $20,000, principal. 2d. That, being such owner and possessor, the said Richardson, on or about the day aforesaid, deposited the said bonds with the defendant, Peter B. Cran- dall, and left the same in his possession. 3d. That after- wards, and on the 14th day of March, 1865, the said Aaron Richardson, for a good and valuable consideration, sold and assigned said bonds, and the moneys secured thereby, to the plaintiff in this action. 4th. That afterwards, and before the commencement of this action, the said plaintiff demanded of and from the defendant, said bonds and each and all of them, which was refused." The plaintiff thereupon rested.

The defendant, by his counsel, thereupon offered in evidence the following, being the balance of the stipulation, viz :    .

"1st. That said defendant was, at the times above men- tioned, and before and afterwards, the provost marshal of, and for the 21st congressional district of the state of New York, under the laws of congress, and as such was engaged in enlisting, mustering and swearing men into the military service of the United States, under the call of the President,

of the 19th of December, 1864. That the aforesaid deposit of bonds was required by the said defendant, as provost marshal, of the said Aaron Richardson, and was made by said Aaron Richardson, as a security (to the amount of $550 per man,) that the men then and thereafter to be presented by said Aaron Richardson, on behalf of certain towns, for enlistment, and who should be mustered and sworn into the military service of the United States, by the said provost marshal, would, after being so mustered, and sworn, go forward and be received at the designated rendezvous; or, in other words, would not desert the service before reaching said rendezvous. That said agreement, upon which the aforesaid deposit of bonds was made, was by parol and not otherwise. 2d. That of the number of men so presented and mustered, and sworn into the military service of the United States, twenty-four men did desert the military service of the United States, before reaching said rendezvous, and were not received thereat, but escaped on the way thereto. 3d. That at the time the above agreement was made between the said defendant and the said Aaron Richardson, the board of supervisors of Oneida county had authorized not to exceed $700 as the bounty for enlisted men, or 'such less sum as the recruits might agree to take, and no more;' and when said men presented by said Aaron Richardson for enlistment, as aforesaid, and for whose arrival at rendezvous, said bonds were as aforesaid deposited for security, were brought to the office of the defendant for enlistment, they were informed by him that the county of Oneida would give the above named bounty of seven hundred dollars, and that if said Aaron Richardson would not pay that amount, others would, and they were not bound by any contract made to take a less sum, and he would secure for them that amount. The said men, or recruits, stated, and persisted in stating, that they had agreed to enlist for fifty dollars bounty each, and that they were satisfied with that sum, and they were mustered in for that sum, and said sum of fifty dollars was paid to the

defendant for said recruits, respectively. It was under these circumstances, and to guard against apprehended desertion, that the defendant required the deposit of bonds aforesaid. 4th. This stipulation is made, and to be used for this trial only, and the foregoing facts, and each of them, are subject to all legal objections, and exceptions, as to their relevancy, competency or admissibility. Dated Nov. 21st, 1865."

The plaintiff, by his counsel, objected to this part of the stipulation being read in evidence, upon the following grounds, viz: 1. That the evidence was incompetent, and did not constitute a defense to the action. 2. That the proposed evidence was not admissible under the pleadings. 3. That the proposed evidence was inadmissible, under the defendant's answer, the answer being only a general denial; and that the proof tended to make an affirmative defense (if any) by setting up a special property, which must be specially pleaded. 4. That it was incompetent under the pleadings, and incompetent for any purpose.

The court overruled each of said several objections, separately and respectively, and the plaintiff excepted to each of such rulings and decisions, separately. The plaintiff thereupon made the same objections to each and every part of the said evidence, and said facts, separately. The court overruled the objections, and the plaintiff excepted. The stipulation was thereupon offered and read in evidence, and the objections of the plaintiff, thereto, were made, according to the provisions and reservations contained in the stipulation for that purpose.

The evidence being closed, the counsel for the plaintiff submitted to the court the following propositions, and each of the same separately, and requested the court so to hold and decide, viz: I. That the transaction, agreement, or bailment, under which the deposit of the bonds was made, is void, for the following among other reasons: 1st. It is void as required and taken by a public officer, "*colore officii*." 2d. It is void as against public policy. 3d. It was void as

being an excess of official authority, and made and imposed by the defendant without authority of law. 4th. It is void as being a naked agreement, without consideration to Richardson. 5th. It is void as within the statute of frauds, being collateral to an agreement or undertaking to answer for the default or miscarriage of third parties. 6th. It is void as being a wager, or gambling contract, without consideration to Richardson, both under the statute and common law, and one forbidden by statute, and for which the statute gives the right of recovery back. The court overruled each and every of said propositions separately, and each and every part thereof, and refused so to hold and decide, or any part thereof, to which said several overrulings, refusals and decisions of the court, the counsel for the plaintiff separately and severally excepted, and to each and every part thereof separately.

II. The plaintiff, by his counsel, thereupon submitted to the court the following further proposition, and asked the court so to rule and decide, viz : That the bonds having been deposited as security upon an illegal and void transaction, requirement or agreement, the plaintiff was entitled to maintain this action. The court overruled the said proposition, and each and every part thereof separately, and refused so to rule and decide ; to which ruling, refusal and decision of the court, the counsel for the plaintiff excepted.

III. The plaintiff, by his counsel, thereupon submitted to the court the following further proposition, and requested the court so to rule and decide, viz : That upon the whole case, the plaintiff was entitled to the bonds, and to the possession thereof, and to judgment accordingly. The court overruled the said proposition, and each and every part thereof, and refused so to rule and decide, to which said ruling, refusal and decision, the counsel for the plaintiff excepted.

IV. The counsel for the plaintiff thereupon submitted to the court, that in any event the plaintiff was entitled to the surplus of said bonds, over and above $550 each for twenty-

four men, and to the possession thereof, and to judgment accordingly. The court suggested that this action was not founded on any such theory, and the pleadings and issue framed would not allow of any such relief, even if it were not for other reasons inadmissible, and, therefore, in deciding the case, overruled the said proposition of the plaintiff, and refused so to rule and decide, to which said several overrulings, refusals and decisions, the counsel for the plaintiff excepted.

The court thereupon found the following facts in the case, and the following conclusions of law, viz: 1st. On or about the 30th day of January, 1865, Aaron Richardson, the assignor of the plaintiff, was the owner and possessor of the several bonds set forth and described in the complaint in this action, being twenty-two in number, and amounting to $20,000 of principal. 2d. Being such owner and possessor, the said Aaron Richardson, on or about the day aforesaid, deposited the said bonds with the defendant, and left the same in his possession. 3d. Afterwards, and on the 14th day of March, 1865, the said Aaron Richardson, for a good and valuable consideration, sold and assigned the said bonds, and the moneys secured thereby, to the plaintiff in this suit. 4th. Subsequently, and before the commencement of this action, the plaintiff demanded of and from the defendant the said bonds, and each of them, which was refused. 5th, 6th and 7th. The same facts set forth in that part of the stipulation offered in evidence by the defendant, as above. 8th. The making and completion of said agreement, and the holding of said bonds in pursuance thereof, was reported by the defendant to his superior officer in the United States service. 9th. The said agreement was fully executed before the commencement of this suit, and nothing remained to be done by either party to consummate or give effect thereto.

As conclusions of law, from the foregoing facts, the judge found and decided, that the defendant was entitled to hold and retain the possession of said bonds, and that the plain-

tiff was not entitled to recover or retain the same, or to the possession thereof, and he ordered a judgment for the defendant, providing for the return of said bonds, and that the complaint be dismissed, with the costs of the defendant to be taxed.

The case below is reported 30 *How. Pr. Rep.* 134.

The plaintiff appealed from the decision and judgment, to the general term.

*John D. Collins* for the appellant. The learned justice, in deciding this cause at circuit, puts his decision upon two grounds, viz: 1st. That the contract was executed, and not executory; that it was fully closed on both sides, and nothing remained to be done; that the breach or forfeiture itself applied the bonds *in rem,* $550 per man, the moment a recruit deserted, and that this application made it a completed contract; that the exaction or requirement was ostensibly meritorious in tendency, and that the imposed contract was therefore binding and obligatory. If such be the case, then the question arises, what becomes of the balance of $6800 due in our favor? These can not be said to have been pledged for any purpose. The deposit was of bonds, $550 per man, and *each* of the bonds was demanded. 2d. That if the contract was illegal, then both parties are *in pari delicto,* and neither can enforce the contract or seek relief against the other.

I. Are the parties then *par delictum?* Let us inquire when they are so, and what is the test. The cases relating to this point are numerous, and by reference to them it will be found that in all cases parties are only so, 1st. When they stand on equal footing with each other. (1 *Bish. on Crimes,* §§ 434, 424.) 2d. When they equally do, or agree to do an unlawful act, *i. e.* first, an act forbidden by statute; or, secondly, an act evil in itself, or contravening the public good. Relief is always given where the statute or the transaction marks the criminal. Now, what was the unlawful act

in this case done, or to be done, by either party, forbidden or *malum in se?* For towns to present men for enlistment, was certainly not unlawful, and the plaintiff's assignor was the agent of towns. For the defendant to muster men into service, was also lawful—nay, more, it was his sworn duty. For the public at large to prevent desertions, was also lawful, and his honor says was meritorious. Then, we ask, what was done, or to be done, by or for Richardson, unlawful or forbidden, which puts him *par delictum. Nothing.* The deposit was *required, i. e.* exacted of him, before the defendant would do his duty. It was simply a hazard—a *contingent event,* viz: future commission of a crime by some third party, not in privity with the transaction, and for which neither was responsible. The deposit was required of Richardson by an officer in command, and submitted to by him under a necessity, (may be a pressing necessity,) and under threats of depriving his towns of these, and other men. It was submitted to by him in order to obtain fair play for his towns. It was not voluntary. Richardson was acting as the agent of towns, not for himself, was fairly obtaining men, upon instructions, for the lowest price he could. The defendant is provost marshal, and as such he required the plaintiff's assignor to deposit $20,000 *from his own money,* (not the town's,) as security that men presented for towns should not desert within a certain time. It was not only for men that were *then* presented, but was also required for men who might *thereafter* come to enlist—men the defendant had never seen. Men that perchance would come, or perchance never come at all; who might enlist upon one contract for bounty, or some other; or who might bear earmarks of fraud, or might not. Now, are these parties equally guilty? Or was it not a transaction of the defendant's own unlawful exaction, and official oppression? If they had agreed to let these men desert, then they would be *par delictum.* But the reverse is the fact. It was that they should not desert, and this before the defendant would do his duty with regard to mustering

Richardson *v.* Crandall.

them in. So far as relates to preventing desertion, the aim was meritorious; but his honor should have gone further, and said that the means used by the defendant were unlawful and oppressive, without authority, and against public policy. Here were towns providing liberally, even to extravagance, with the $700 bounty, qualified with a view to economy, and their agent using economy according to instructions. But the defendant, knowing this, is not satisfied. He says, at the critical moment, to the recruit: "I will secure you more; and you are not bound by your contract;" and to the towns' agent: "I demand $550 per man, security from you, to be put into my own hands." The unlawful act is entirely on the part of the defendant. He required and exacted without any authority. He tries to have the recruits enlist for other towns, or other persons, against the spirit of section 23 of the act of congress, for enrolling, &c. the national forces. He assumes to say how much bounty these towns shall pay, and thus control and interfere with local bounties. And does all this at the critical moment. He effects an insurance on the contingency of future desertion from his own command. Has he an insurable interest in good faith in this matter? Has the United States such an interest, even if they had ever ratified it? But, above all, where is the defendant's, or any present interest in the men "thereafter to be presented," and how is it to be known who they are? How did the defendant know that men who might at some future day come to enlist, would come bearing earmarks of probable or apparent intent of fraud or crime? What right has the defendant to interpose such a pretense in advance of their coming, at the critical moment when the towns are almost, but not quite, out of the draft? He has no right—it is grave assumption. (*a.*) Now, take what view we will, of this case, and what is it but an insurance, without consideration to the insurer, or assurable interest in the assured? All such insurances are of the wager character—all such policies without interest are most pernicious and evil in tendency, if upheld. They are

expressly within the statute of wagers. The cases on this point, and using this express language, are cited below.

Now, will this court give its sanction to the monstrous doctrine that an officer may devise suspicions, and charge uncertain intents of future crime, of one set of men, and call upon and require other citizens to insure him against these contingent events, on a pretense of insuring the government, when the government don't even recognize it? May such an officer be allowed to go further, and devise *contingent contingencies*, and require a deposit of $20,000 in his hands as a forfeiture on its happening, that is, "if recruits hereafter enlist, and if they thereafter desert?" Will this court go further than this, in the face of the statute, and wager decisions, and hold that the parties stand on equal footing, and are equally guilty—having equally conspired to do an unlawful act—and declare that the officer may therefore keep and hold the fruits of his own wrong and oppression? Are you and I in *pari delictu* with a provost marshal, with almost absolute power, when required by him under a pending draft? Will this court hold the doctrine, (for it can't be put in any other light, on the facts,) that when an officer makes an unauthorized requisition of an individual, without consideration, and without sanction by the government whose agent he is, the individual has no remedy to disaffirm or rescind, because the rule *par delictum* cuts him off? Will this court declare that an officer may keep money lawfully required; and that we are *in pari delicto*; because we yield to him under necessity? If so, then where is the protection of individuals from oppression of officers, except by violence? Imagine for a moment the consequences, if this agent of towns had not conformed to this requirement, and we can surmise, as he well knew, the result was draft, or worse. We must beware of carrying this rule too far. The question is a grave one, and comes home to us, if we are to apply this rule *par delictum* in shielding officers who make exactions, and thus indirectly aid them to accomplish this design, viz :

Richardson *v.* Crandall.

keeping the fruits of their transgression, and more too, as this case illustrates, by about $6800. The question is, will the court do this, or will it throw a shield to individuals who seek to be relieved of an oppressive requirement, and have his own again ? And will it not do so, not less out of regard for our rights than to deter other officers from oppression, and protect those who become their victims. To defeat a recovery in this case, by rule *par delictum,* is the affirmance of an official unlawful oppression. An officer, however corrupt, can ask nothing more than to be left where he is found, viz, he to keep the money, and the plaintiff to lose it and pay the costs. The officer to make it, as he intended, and the plaintiff to lose it, and more too. The officer to have what is conceded is not his, but which came by unlawful means from the plaintiff. We submit this is not law—is not justice—it is calamity upon misfortune. It tends to the worst of evils. It is example, justification and incentive to all officers to commit the same, or worse extortions and oppressions. It provokes violence and crime on the part of citizens, in resistance of unlawful oppressions and requirements. It creates distrust and disobedience of citizens to the lawful and proper authority, and duty of officers. In the language of Dennison and Foster, JJ. in *Stotesbury* v. *Smith,* (2 *Burr,* 924,) "If this was to be permitted, it would introduce such a scene of oppression and injustice as would be insufferable." The doctrine laid down and cited in *Clark* v. *Shee & Johnson,* (*Cowp.* 200,) is more correctly the rule. Lord Mansfield says : "There are two sorts of prohibitions enacted by positive law : 1st. To protect weak and necessitous men from being overreached, defrauded and oppressed. There the parties are not *par delictum,* citing case of *Bosanquet* v. *Dashwood.* The same language is used again in *Smith* v. *Bromley,* (*Doug.* 696, *note.*) This was a case where a *third party* paid money, against the statute, for the benefit of a bankrupt. Lord Mansfield says, 'that though both are parties they are not equally guilty, because the

bankrupt is an oppressed party,' and 'that it makes no difference whether it be the bankrupt or his friends that pays the money.' If the laws for the protection of subjects from oppression, &c. are violated, and the defendant takes advantage of the plaintiff's condition or situation, then the plaintiff shall recover ; and it is astonishing that the reports do not distinguish between the violation of the one sort and the other.'" Again, in *H. Black*, 56, 67, it is laid down, "That when the action proceeds in disaffirmance of an illegal contract, and instead of seeking to enforce it, presumes it void, and seeks to prevent the defendant (not an officer in that case) from retaining the benefit which he has derived from his unlawful act, there it is consonant to the spirit and policy of the law that the plaintiff should recover." *See Comyn on Cont.* where this doctrine is cited, (*p.* 93, *marg.* 109.) And the doctrine there goes further : "That there are cases, where notwithstanding the contract is executed and illegal, the party who has paid the money under it has been allowed to recover it back, on the ground that it is deemed expedient, upon principles of public policy, in order to prevent a repetition of crimes, or the evasion of a public act, to allow the party paying it to recover it back." (2 *Comyn on Cont.* 93, *marg.* 109.   *Story on Cont.* §§ 486, 491.)

We submit that there can be no stronger case of public policy—no stronger case to prevent a repetition of like crimes or oppressions by officers, or like "evasions of public acts," than the one now under consideration.   And we submit that his honor, in deciding the case, has given the wrong party the benefit of the rule "*potior est conditio defendentis.*" Selden, J. in *Tracy* v. *Talmage*, (4 *Kern.* 162, 182,) says, as to protection of one party from oppression, &c. :   " The first cases in which the principle was applied, were naturally those where the statute violated was intended for the special protection of the party seeking relief from undue advantage taken by the other, because those were the cases in which the injustice of applying the rule to both parties would be

Richardson *v.* Crandall.

most glaring. But it soon came to be seen that the principle was equally applicable to cases where the law infringed was intended for the protection of the public in general." On page 184, he further says of the English cases : " It is plain that they do not rest solely upon the ground that the statute infringed was intended to protect one party from acts of oppression or extortion by the other; and equally plain that relief is granted in this class of cases entirely irrespective of the question whether the contract be executed or executory. It was, in fact, *executed* in all these cases." We submit further, that the statutes of this state, in tendency and by implication, at least, are entirely in accordance with this last doctrine ; and in reference to wagers, have expressly overruled the doctrine of *par delictum,* and given a recovery back in cases where, before the statute, the rule was applied. In this it proceeds in the most strict and liberal justice. In some of the cases under it, the courts have said that the legislature have thought that the surest and most effectual way of preventing illegal transactions, is to give to all an effectual remedy for their full rights. (*Morgan* v. *Groff,* 4 *Barb.* 530.) The late decisions have been in the same tendency. In *Tracy* v. *Talmage,* (4 *Kernan,* 162,) the following language of Judge Wilde, in *White* v. *The Franklin Bank,* (22 *Pick.* 181,) is cited and approved : " To decide that this action can not be maintained, would be to secure to the defendants the fruits of an illegal transaction, and would operate as a temptation to all banks, (officers and provost marshals,) to violate the statute by taking advantage of the unwary," &c. Selden, J. in *Tracy* v. *Talmage,* (*p.* 187,) further says : " The defendant may pocket the entire sum without value, if this judgment be affirmed ;" and " that such a principle would afford the strongest possible inducement for banks (officers, &c.) to transgress the law." The same judge, in this opinion, (*p.* 186,) cites and approves the language used in *Mount* v. *Waite,* (7 *John.* 434,) where Kent, J. says : " The plaintiffs committed no crime in making the

contract. They violated no statute, nor was the contract *malum in se.*" The action was to recover back money paid by the plaintiffs as premium on an insurance of lottery tickets. It was held they could recover. In *Schroeppel* v. *Corning,* (5 *Denio,* 245, *affirmed* 2 *Seld.* 107,) Beardsley, J. says : " The borrower of money upon usury is a slave to the lender, nay more, a slave in chains. He may have had some pressing need for the money." It will be seen that none of these cases are as strong as the case at bar. 1st. In that here the $20,000 deposit of security *was required by an officer.* 2d. In a transaction where the officer had power to stand in the way of the enlistment of these men. 3d. From the private funds of a citizen acting for towns, in a matter of the towns exclusively. 4th. Upon an oral agreement. 5th. On a pretense of the officer that it was for the government. 6th. Not ratified by the government. 7th. To guard against a contingent, future fraud or crime. 8th. Contingent fraud or crime of men not yet enlisted, or presented for enlistment, but who might or might not be enlisted. 9th. Not upon an illegal contract, but to effect an unauthorized insurance to the officer. 10th. Upon express overt acts of oppression, by trying to have the recruits forsake the towns which had procured them, and enlist for some other. And we submit, that under the necessity of a pending draft, with fifty days allowed by law only, in which to fill the quota — a proceeding harsh, arbitrary, and terrifying in the eyes of citizens — a provost marshal, with absolute power of acceptance or rejection of recruits, demanding to himself any indemnity he sees fit, (for if he may demand $20,000, why not $2,000,000, if he thought he could get it,) we submit whether such an officer does not stand on unfair grounds, and whether towns, or their agent, or citizens, *are not an oppressed party, completely in the power of the defendant,* under the necessity of filling the quota, as much as a bankrupt, or the borrower of money upon usury ; especially when the avoidance of a draft is dear as life itself.

We submit, too, 1st. That the plaintiff's assignor is an oppressed party, innocent of any illegal act or design. 2d. That the defendant stands on unfair grounds, using his office, and drawing upon the obedience of subjects to officers, as a means, (1 *Bish. on Crimes,* § 434,) and that this transaction was in effect an extortion or exaction, under official duress and coercion, which under no circumstances in this case can shield or protect him from delivering up the identical thing he required. 3d. We submit further, that even if there be any thing on the part of the plaintiff illegal, it is only of such a character as leaves him the less guilty, and so is entitled to relief; that at most it was only an offense against the statute of betting and gaming, which gives him a recovery back. (*b.*) There is no such thing as *par delictum* between the government and its citizens. Between it and them there is always the strictest justice, and the constitution provides that "private property shall not be taken for public uses, without just compensation." (*Amd. Const. U. S. art. 5.*) If the government, by its officers, can be guilty of unlawful acts, and can keep property acquired from citizens, without compensation, because the government or its officers, with citizens under requirement, are *in pari delicto,* then it seems the constitution does not mean all it says, and must be taken with grains of allowance. Do officers who take the oath to support the constitution, take it with a qualification *in pari delicto* excepted? *i. e.* private property I will not take for public uses without just compensation, except that when it is so taken we are equally guilty. Whatever may be the rule with reference to other laws, the constitution must have a broad significance, and the government will do justice when its officers go too far. His honor admits that an action by either to enforce the muster or the deposit, would not lie. Then, as between the United States and the plaintiff, equity must still be done. As between plaintiff and defendant in his individual capacity, it was *colore officii.*

II. Was this exacted contract executed, or executory?

Under this head we propose to discuss, 1st. The question itself. 2d. Whether that is any defense; and 3d. The case as it is, on its own merits.

On the facts found, Richardson owned the bonds, and left them in the defendant's possession. On the defense, that the defendant was provost marshal; that Richardson was "presenting men for enlistment on behalf of towns;" that the defendant required him to "deposit," as "security," $20,000, ($550 per man,) that men then and thereafter to be presented should not desert the military service; and that the defendant told them that other persons would give them $650 more than Richardson would. The first question is, for whose benefit was this? Who were the bonds to go to upon breach? Was it to the defendant? If so, then this action can not be defended for one moment. Was it to the United States? If so, then the defendant was an agent simply between the bailor and the United States, and the bonds never passed to the United States, and the United States never ratified it. There was, then, something more to be done, viz, paying over to the United States. Then it was not executed. Let us see what the cases say. In *Edgar* v. *Fowler*, (3 *East*, 225,) Lord Ellenborough says: "In illegal transactions the 'money may always be stopped while *in transitu* to the person who is entitled to receive it." There, the case was an *illegal* transaction. Here, it is simply a *void* one, with the illegality consisting simply in the *requirement by the defendant*. (*See also Story on Bailment*, §§ 103, 104; *Story on Agency*, §§ 300, 301; *Story's Eq. Jur.* § 1046; *Wheaton* v. *Hibbard*, 20 *John.* 290, 293; *People* v. *Whaley*, 6 *Cowen*, 661; 4 *Barb.* 51; *Imlay* v. *Sands*, 1 *Caines*, 566; 1 *Hill*, 314; *Rice* v. *Peet*, 15 *John.* 503; *Ripley* v. *Gelston*, 9 *id.* 201; *Frye* v. *Lockwood*, 4 *Cowen*, 454.) Again, the words are "deposit as security." Deposit is defined to mean "bailment," and security means "*to make more safe*." (*Bouv. Law Dic.*) The words "*deposited as security*," implies some original undertaking,

Richardson *v.* Crandall.

to which the bailment was collateral. What was it? It was a pledge of $550 per man, of bonds, collateral "to make more safe" the payment by the towns for such men as deserted. The language clearly implies the right to redeem the bonds. Upon failure of towns to pay, they were to be forfeited ($550 per man) and sold as a pawn. Something more then remained to be done, viz: 1st. To ascertain the amount. 2d. To give notice to pay. 3d. To sell on failure ; and 4th. To pay over to the United States. To say that the bonds were to be applied *in rem*, is a different contract from what is proved or alleged. No such thing was intended. It was a *security*, not *payment*. Yet, in this view it still remained to ascertain the amount, viz, $13,200, separate it from the balance, and pay over to the United States. But, above all, how is it executed, when the United States, after being notified, does not assent to or ratify the transaction, after eight months. Can it be said, after this, that this pretense of a contract, made under a requirement, is executed? We respectfully deny the fact. (*a.*) Was there a promise to pay $550, or any sum? There is not one word of it in the proof. This brings us to another proposition. There was no promise to pay. The deposit was to *hold*, *simply*, and be returned, of course. To this extent, and no further, it was, (perhaps,) a salutary requirement to influence the minds of recruits. But to carry it to the extent now proposed, is an after thought, and an attempt to convert to his own use ; and his offer to transfer the bonds clearly proves this intent. The exaction, under pretense that it was for the United States, was false; the pretended suspicion of fraud and crime of men not yet before him, was a sham device, although "verified by results," which may have been brought about by himself; and this, together with his subsequent offer to assign the bonds, is an attempted fraud and imposition on the courts, and the acts of the defendant are an oppression and extortion from which there

is no escape or palliation. It was downright perversion of his official power and authority, using his office and position as a means to oppress citizens and draw upon their obedience to authority, under circumstances of general pervading fears of the people of an impending draft. ·

May the United States, or its army officers of their own motion, speculate in $550 per man insurances on the entire army, as a matter of common law? for we defy them to produce an act of congress giving a provost marshal power to receive money on government account, for he gives no official bond as a financial officer, and makes no returns as such. More than this, a provost marshal has no right or business with the local bounties of soldiers, beyond seeing to it that they are satisfied with what they get, and are not deceived. Above all, may the defendant, on his own account, make $550 per man insurances, using his office as a means, and the occasion as an incentive? As to insurance without interest, Selden, J. in *Ruse* v. *Mutual Benefit Life Ins. Co.*, (23 *N. Y. Rep.* 516, 523,) and Davis, J. in 26 *id.* 422, say "such policies, if valid, not only afford facilities for a demoralizing system of gaming, but furnish strong temptations to the party interested, to bring about, if possible, the result insured against. The obvious temptation presented by a wagering policy, to the commission of the crime of arson, has generally led the courts to hold such policies void, even at common law. In this state such policies would fall under the condemnation of our statute, avoiding all wagers and gambling contracts of every sort." And we would suggest, in the light of this language, that provost marshals, with discretionary power of mustering or rejecting recruits; of judging of extraordinary circumstances or not; and of taking security, or not, and the $50 bounty in their own hands, never to be called for after desertion, and $550 more, to be forfeited on the result, which may or may not be accounted for, have an incentive and temptation, in the language

of Judge Selden, "to bring about, if possible, this result."
It being the marshal's duty, by act of congress, to forward
recruits to rendezvous, how easy a matter it would be for
some of them to miss a train, and be reported deserters,
and never be looked for again. We suggest it as marvellous,
that there have been comparatively so few desertions, and that
it might be a fruitful source of inquiry, if herein be not the
real source and cause of what desertions there have been.
If we will inquire, we shall find that where bounties of sol-
diers have not been paid to provost marshals, the desertions
are few, and where provost marshals had the money, desertions
are many. In *Smith* v. *Bromley,* (*Doug.* 696, *note,*) Lord
Mansfield said "it was iniquitous and illegal in the defend-
ant to take, and therefore it was so to detain, this £40. If
a man makes use of what is in his own power, to extort
money from one in distress, it is certainly illegal and oppres-
sive, and whether it was the bankrupt or his sister that paid
the money, it is the same thing. The taking money for
signing of certificates, is either an oppression on the bank-
rupt or his family, or a fraud on his other creditors. It was
a thing wrong it itself, before any provision was made against
it by statute ; for if the bankrupt has conformed to all that
the laws required of him, the creditors ought in justice to
sign his certificate, but if the bankrupt is guilty of conceal-
ment of property, then the creditor ought not to sign for
any consideration whatever." And this is precisely the doc-
trine held in *Schroeppel* v. *Corning,* where the borrower of
money is declared to be a slave to the lender. In *Stotes-
bury* v. *Smith,* Lord Mansfield says : "The man who gave
fifteen guineas to obtain bail, has been injured by both these
contending parties. The officer shall admit to bail, or not
admit, according to circumstances, *as a duty,* but he shall
not take money for duty." Dennison, J. said he "never saw
such a demand stated in court. If it was permitted it would
introduce such a scene of oppression and injustice as would
be insufferable. He said further, "that the caution of courts

is not to endure the oppression of officers." Foster, J. said "it would be a great inlet to oppression. We should have punished this officer for this piece of behavior, if complaint had been made to us, and surely we shall not now help and assist him to obtain the end of it, and carry it into complete execution." Wilmot, J. thought it "a shameful and scandalous action. It would be a strange thing if we should assist him in a contract founded upon a consideration which would have been punished by this court. If good and unexceptionable bail be offered, he is obliged to accept it, but he shall not take money for doing his duty. It is his duty to take good and sufficient bail, though he is not obliged to accept insufficient." The same principle was held in *Callagan* v. *Hallett*, (1 *Caines*, 104.) The court says: "it was the *duty* of the pilots to assist defendant's vessel in distress, and it was oppression in them to exact the stipulation in question. It would lead to abuses of the most serious nature, if such contracts were held to be legal. There are several cases in the books, tending to show the leaning of courts of justice against the oppression of persons in public trust, and the illegality of exacting previous reward for doing their duty." In *Ripley* v. *Gelston*, (9 *John*. 201,) the defendant was collector of tonnage, and demanded tonnage on granting clearance to a ship, which was paid to him, and by him paid over to the United States. The defendant was, as he supposed, doing his duty, but it turned out to be a case when no fees for a clearance were payable. The court held they could be recovered back of the defendant, even after paid over to the United States. The same doctrine was held in *Frye* v. *Lockwood*, (4 *Cowen*, 454.)

We submit that the language of Judge Wilde, in *White* v. *Franklin Bank;* of Selden, J. in *Tracy* v. *Talmadge;* of Beardsley, J. in *Schroeppel* v. *Corning;* of the court, in *Ripley* v. *Gelston;* of Kent, J. in *Mount, et al.* v. *Waite;* of the court, in *Callagan* v. *Hallett*, and *Stotesbury* v. *Smith*, and Lord Mansfield, in *Smith* v. *Bromley*, applies with

great force, and is controlling and decisive as to a recovery in this case upon the soundest principles of law. We submit, too, that the contract, though far from being executed, yet under all the circumstances of the proof, it makes no difference whether it be executed or not, since the defendant, under threats of privation and duress, took for his own benefit, without any authority. If he took for himself, then it was extortion, and we must recover, because he alone is the guilty party. And if he took for the United States, mere notification after the fact, without express ratification, is not enough to give it even the color of a defense, much less as an executed contract. For, as Lord Ellenborough said, in *Edgar* v. *Fowler*, "in illegal transactions money may always be stopped while *in transitu* to the party entitled to receive it." But here is a defendant, an officer, who, of his own motion, attempts to enlist the men to other towns, demands and receives a deposit, without assent before, and without ratification afterwards by the United States, and for a purpose not expressly authorized by law, in an amount fixed by his own discretion, for a period of time to suit his own convenience, from a citizen, for men presented in behalf of towns, and where towns, and not the citizen, alone are interested, (if interest there be at all,) without consideration, upon an oral understanding ; not to guard against a committed crime, but suspicions only of a future crime, not of the town or agent, but of some one else, not privy to the transaction, but under control of the defendant exclusively ; and while the property is still in possession of the officer, the identical thing is replevied, and not restored to the defendant by the proper proceeding. Can it be said that this is an executed contract, beyond the reach of the court ; or can it be said that it makes any difference whether it be executed or not, for purposes of relief in the action ; can it be said that this identical property shall now be taken out of the plaintiff's possession again, as it was in the first instance, and applied again to the same unlawful purpose, when the

defendant, by his original answer, never asked for a redelivery, nor took legal steps for a restoration?

But there are cases cited which relied on for a contrary doctrine. The first is that of *Decker* v. *Judson*, (16 *N. Y. Rep.* 439.) The action was on a bond to the sheriff, in a replevin suit, where security is both proper and necessary, and a liberal interpretation was given it to meet a necessity. The second is that of the *State* v. *City of Buffalo*, (2 *Hill*, 434.) This was an action on a bond taken by a state officer to the state, for the safe return of state arms loaned to the defendant. The consideration was the receipt of the property by the defendant, and the state ratified it and brought the suit. We do not think it will be contended that state arms were loaned to the plaintiff's assignor in this case, nor even that the recruits who deserted were borrowed by him, so as to make a consideration. Another case is that of *Staples* v. *Gould*, (5 *Seld.* 520,) which is by far the strongest case, most in point, and yet far from being so when we look at the case fully. There the deposit was made by the plaintiff with his broker, who was the *agent of the plaintiff*, as an indemnity to act for the plaintiff in selling stocks which neither owned at the time, or had authority to sell. The selling of stocks in this way was prohibited at the time by the statute of stock-jobbing. It was held in that case, as the head note says, that the plaintiff might have recovered, only for the *statute against stock-jobbing.* If it be contended in this case that the plaintiff might have recovered but for the stock-jobbing statute, or any statute, then we suggest that the stock-jobbing statute was repealed by the laws of 1858, and the other statute is not yet found. By that statute, if the plaintiff had paid either as a buyer or seller, he could recover, but having *counseled and abetted his agent* to contravene the statute, the statute gave him no remedy; the statute had marked him as the guilty party. There are other cases where officers have been allowed to take security, but in all, it will be found, there has been a consideration, in addition to

Richardson *v.* Crandall.

some necessity for upholding, of value parted with. The case of *Webb* v. *Albertson*, (4 *Barb.* 51,) is also relied upon, which says that proper security in proper cases is sometimes upheld. But in that case it is expressly held that a bond of indemnity taken by commissioners of highways on laying out a highway, is against public policy, and void ; and the court says, (*p.* 54,) "It is their duty to decide whether public convenience requires a new road to be laid out or not. If they determine erroneously, either in making or refusing an order, an appeal lies. They have no business to be tampering with parties, or making conditions. They have no right to say that if they order a highway to be laid out, individuals shall assume the expense. If the convenience or interest of the public requires it, and commissioners are honestly of that opinion, the expense should be left where the law places it, a public charge. If not, then they ought not to swerve from duty by the offer of individuals to bear the expense. Such a step would look like surrendering their opinions to the highest bidder. If allowed, it would become the means of the grossest injustice, dishonesty, and oppression." *Winter* v. *Kinney*, (1 *Comst.* 365,) is also relied on. Page 368, Wright, J. says : "The policy of the law in declaring securities void, is to guard against official oppression on one side, and lax performance on the other. But when an officer, instead of taking the obligation specially prescribed by statute, takes one at *his own volition* more or less onerous to the prisoner, he asserts by virtue of his office an illegal claim of right or authority to take it. He takes *colore officii."* What was this apprehension of desertion, and this fixing the amount at $550 per man in advance, but matter of his own volition. This is so, whether he took for himself or the United States, so long as it does not meet the case, either as to the amount of local bounty, or tend to prevent the crime. So, too, as to the time for which security was required ; for if he was to take security at all, why not require it for the whole period of service ; why exercise his

own volition and take it only for reaching the rendezvous? The case is directly in point to a recovery in this case, for the action was to recover back a deposit by a third party, as in this case, and it was held he might recover, for the money was held without consideration. In that case, there was a release from arrest. In this case, the recruit was still kept under command of the defendant, and it at least ought to be alleged that the desertion was without any fault of the defendant, and that he had used due diligence. Suppose a prisoner were in jail, and had shown an intent to break jail or fire the jail, and the jailor, of his own motion, should take an indemnity to the county against it? Could it be upheld? Would it not be *colore officii?*

III. It is said there was a well founded suspicion of an intent to commit a future fraud or crime, and that it was no usurpation of power or prostitution of office for the defendant to require an indemnity. Enough has been said to answer this point effectually. But let us consider it in that light, and review the cases, though none are cited in support of the proposition. First, we deny that there was any well founded suspicion. Second, if there was a suspicion, it was a suspicion only; for no fraud or crime had been committed. It was no justification; the deposit was not payment, but security only, and such an intent could not be reached by this method. But if fraud or crime was manifest, then he had a plain duty to perform; not to put the men in irons, but simply not to muster them in, or if mustered in, to call on towns to put in other men. Above all, he shall not take and hold indemnity for duty, or enforce duty from soldiers under his command, by $550 indemnities from citizens, when the United States, from whom he is acting, do not ratify it after eight months' notice.

In *Leglise* v. *Champante*, (2 *Strange*, 820,) the action was against the defendant, who was a custom house officer, and had seized several hogsheads of French wine, on pretense of its being lees. It was held that the officer acted at his peril,

and "*that probable cause was no defense.*" In *Campbell* v. *Hall,* (*Cowp.* 204, 205,) the action was to recover back money from a collector of customs. The court says the money was paid to the defendant without any consideration, the duty for and in respect of which it was paid not having been imposed by lawful or *sufficient authority.* And what is this case but money *exacted or imposed* without lawful or sufficient authority? In *Bostock* v. *Saunders,* (3 *Wils.* 434, 440,) Gould, J. says: "Probable suspicion of concealed teas is no justification of a search for them; the whole matter rises and ends with the defendant; he is a mere volunteer." In *Imlay* v. *Sands,* (1 *Caines,* 566,) it is said, "probable cause of seizure is no justification for collector of customs, or other officer, making seizures under the revenue laws of the United States." The action was for trespass, and not for property. Thompson, J. says: "The act of congress under which the seizure was made, makes no provision of exoneration of custom house officers. Nothing appears but that the defendant acted in good faith, and though he ought to be protected, yet we are bound to pronounce the law as we find it, and leave cases of hardship to legislative provision." It will be seen that the act of congress made it the express duty of officers to seize certain goods. In our case there was no authority to make any seizure whatever, or to take any indemnity, either upon probable or positive cause, and the defendant can not take such indemnity without an express act of congress. In *Little et al.* v. *Barreme,* (2 *Cranch,* 170,) the United States court says "that the instructions of the President of the United States are no justification, further than those instructions are warranted by law." (*See also Murray* v. *Charming Betsey,* 2 *Cranch,* 64.) The same was also held in *Callagan* v. *Hallett,* (1 *Cai.* 104,) and in *Ripley* v. *Gelston,* (9 *John.* 201,) and again in *Frye* v. *Lockwood,* (4 *Cowen,* 454,) and money demanded by a post-master for delivering letters at houses, may be recovered back. (4 *Burr,* 2149. 5 *id.* 2711.)

Two causes are shown why this $20,000 was exacted. 1st. To guard against apprehended desertion; and 2d. Because they would not take $700, instead of only $50, for he is ready and willing to muster the men. Because they would not take $650, he finds excuse to exact $20,000. Now, in this conflict of his own defense, what is the real fact, and how shall he escape bad faith? It is nowhere set up in the proof, or the facts found, that he took for the United States. The decision awards the *bonds to the defendant himself.* The defendant did not reclaim the bonds by giving the security required by section 211 *of the Code,* but called on the plaintiff's sureties to justify. The property is now to be considered in the plaintiff, by virtue of the replevin. If the first taking by the defendant was unlawful, it would be unlawful to award the possession to the defendant again. The defendant had lost his right by not giving security, and reclaiming the property, as required by section 211 of the Code. Possession is nine tenths of the law, if the rule *in pari delicto,* or executed contract, is to prevail.

IV. Under the statute of frauds. The transaction was void for want of consideration, before we come to the statute. But by the statute, no person shall be held to answer for the debt, default, or miscarriage of another, except upon writing, signed and expressing consideration." (2 *R. S.* 135, § 2, *subd.* 2.) The $20,000 was deposited as security. It was a pledge by an oral contract. It was not collateral to secure any *duty of the bailor,* who owned and pledged the bonds. It was not collateral even for any *duty of towns* whose agent he was. It was not for any debt then due, but purely collateral to a contingent, future breach of duty, by the recruit, for which towns could not be held answerable. In *Rice* v. *Peet,* (15 *John.* 503,) it was held that money or property deposited as a pledge, on a contract void by the statute of frauds, to be expressly forfeited on failure to comply, may be recovered back; and the court held that because

the contract could not be enforced, the pledge was without consideration, and could be recovered back. The decision was put on this ground, although other questions were in the case. The contract was a verbal contract to exchange lands, and the pledge was to be forfeited on non-performance of the contract, and it was so held, although nothing appeared to show the defendant was not ready and willing to convey. The case was again reviewed, cited, and approved in *Burlingame* v. *Burlingame*, (7 *Cowen*, 92.) This case is directly in point. Here is a case where the contract could not be enforced on either side, 1st. Because not in writing, and within the statute of frauds, we could not be compelled; and 2d. There was nothing for us to enforce against the defendant which was of any value for our money. The pledge as security, of course, falls, as in *Rice* v. *Peet*. And yet that was far more an executed contract than this. In that case the pledge was a note of a third person, like the bonds in this case, and the plaintiff not only forfeited his contract, but the defendant had collected the money on the note, and applied it in execution, but here is nothing but a breach without application. It may be said that the defendant did muster, and the plaintiff had performed, by his deposit. This does not alter the case, for the mustering is not any consideration. This agreement or requirement was entirely a *collateral one*. It did not relieve the deserter. It did not exempt the United States, or its officers, from the performance of their duties, nor did it suspend the powers of the provost marshal. It was simply a (required) agreement to answer for the default and miscarriage of other parties, to pay on the contingent happening of desertion of various parties. (*Mallory* v. *Gillett*, 21 *N. Y. Rep.* 412.)

V. As a wager. An insurance is defined as follows: When the performance of any thing depends on an uncertain event, the contract in relation to it is said to be "hazardous." "A contract of this sort may be unlawful and

Richardson *v.* Crandall.

void as a wager, or valid as providing security against a future loss." (*Angell on Ins.* § 1.) By 2 *Revised Statutes*, 5th ed. § 8, "All wagers, bets or stakes made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful. All contracts for or on account of any money or property, or thing in action so wagered, bet, or staked, shall be void." Section 9 gives a recovery back; section 10 excepts "insurances made in good faith for the security or indemnity of the party insured, and which are not otherwise prohibited by law." (*See also Ruse* v. *Mutual Benefit Life Ins. Co.*, 23 *N. Y. Rep.* 516, and *Fowler* v. *N. Y. Indemnity Ins. Co.*, 26 *id.* 422.) By this language all contingent guaranties and indemnities, are within the definition of wagers, and hence the law excepts from the operation of the statute indemnities and insurances in good faith, where the assured has some interest of value, in which he may be lawfully protected. We apprehend that all undertakings and recognizances would fall within the definition, but are excepted by being specially authorized provisions of law. Hence they are upheld only when the provisions of law are strictly complied with. From this it is clear that this indemnity required by the defendant is within the statute, and is not excepted. There is no law by which the towns or any one else could be called on to indemnify against the desertion of recruits, and that event being at the time contingent, it is clearly money or property staked, to be lost or won, and may be recovered. If the plaintiff had said to the defendant, "I will bet you $20,000 these men won't desert within a certain day, and put the money up," would it not have been a bet? And if he had said I will bet you $20,000 against nothing, and stake the money in your hands, would it not equally have been a bet? Or still further, I'll bet $20,000 to nothing, that they won't desert, and stake the money in your hands, to be paid over to the United

States if they do. Does that alter the case? And does it alter the case if he says in a more solemn way, I hereby promise to pay $20,000 to the United States if the men desert, and put the money in your hands as security, to be paid over if they do. It is still a bet, for the statute takes express pains to make special use of the word "contract."

VI. Whatever may be the result as to $13,200 for twenty-four men that deserted, the plaintiff is entitled to $6800 of the bonds, being the surplus. The bonds were deposited as "*security,* $550 *per man,*" &c. for such as deserted. The surplus was not put up for any purpose but to be returned. As to this, the contract was not executed, and it remaining unappropriated in the hands of the bailee, may be recalled. It was error in the court to overrule the fourth proposition of law submitted by the plaintiff. The bonds were each demanded and each refused. The bonds were each set out in the complaint.

*H. Denio,* for the respondent.

*By the Court,* MULLIN, J. The defendant was a public officer at the time he received the pledge, which is the subject of the action, and was at the same time in the discharge of the duties of such office. There was, however, no act of congress, no authority of any department, or functionary of the government, which authorized the defendant to demand and receive such pledge. As between the pledgor and the defendant, there was no consideration for the pledge, and consequently no lawful right to retain it from the true owners.

A. authorizes B. to employ for him a clerk, at a given salary, for the term of three years. B. makes the contract precisely as directed, except that he demands and receives of the employee the deposit in his (B.'s) hands, of a sum of money to secure the performance of the contract, on the part of the clerk. In the case supposed, the agent has no manner

of interest in the contract. He has not exacted the pledge for his own benefit, nor has it been given to him with any reference to the acquisition of any interest in it by him. Without the assent of A., the principal, B. has no right to detain the thing pledged. The taking of it was wholly unauthorized, and can be made valid only through the adoption of it by the principal. If an action should be brought by the pledgor, before ratification by the principal, I can discover no possible defense the agent could make to it. When an agent assumes to act in behalf of another, so that the one with whom he deals knows of the agency, he is charged with the duty of ascertaining the nature and extent of the powers conferred upon the agent, and if he is correctly informed, and yet consents to conditions which the agent has no right to impose, he is in the attitude of consenting to the performance of the unauthorized act, knowing that it can be made valid only by the ratification of the principal. Is there not in such a case an implied agreement that before the act done shall be repudiated, a reasonable time shall be allowed to the agent to procure the ratification of the act by the principal? If within such reasonable time there is an adoption by the principal, either expressly or impliedly, it relates back to the time of doing the unauthorized act, and relieves the agent from personal liability. But in every case where an agent acts without authority, he becomes liable personally to the one with whom he deals, upon the contract, if there is one, or for the damages resulting from the unauthorized act, and no act of the principal can relieve the agent from this liability. (*Rossiter* v. *Rossiter*, 8 *Wend.* 494. *Palmer* v. *Stephens*, 1 *Denio*, 471.) So that in the case supposed, the deposit being unauthorized, the agent, when sued for it, must establish a right in himself at the time it was received, or he can not retain it. This principle can work no hardship to either principal, or the agent. Not to the principal, because he neither asked nor expected the

deposit, and withdrawing it does him no injury; not to the agent, because he knew he had no authority from the principal to receive it, and he did not expect any personal benefit from it; so that if he is compelled to surrender it, he is in no way injuriously affected. In the case before us, the defendant knew he had no authority to demand the pledge, and the pledgor is presumed to know that there was no act of congress authorizing the defendant to demand it, but he could not know whether or not the war department or the Provost Marshal General, might not have instructed the defendant to require it, or reject the men offered to be mustered in. He yielded therefore to a condition imposed on him, without color of authority, and in ignorance of the want of authority, if it could have been conferred by any department of the government other than the congress.

The act of congress which creates the office of provost marshal was passed in 1863, and is chapter 75 of the laws of that year. By sections 5 and 26, it is provided that the district provost marshals shall be under the direction and subject to the orders of the Provost Marshal General, and it is made his duty, with the approval of the Secretary of War, to make rules and regulations for the government of his subordinates, to communicate to them all orders of the President in reference to calling out the national forces. By the 7th section of said act, it is made the duty of the provost marshals to arrest deserters, and send them to the nearest military commander or post, to arrest and confine spies, and obey all lawful orders or regulations of the Provost Marshal General, and such as may be prescribed by law concerning the enrollment and calling into service the national forces. The said act further provides for a board of enrollment in each district, whose duty it is to enroll every able bodied man in their district, who is liable to military duty.

Those liable to duty are to be divided into classes, and the President, when additional troops are required, is author-

ized to assign to each district the number of men it is required to furnish, and a draft is then made for the number called for. Those drafted may furnish substitutes, and bounties were offered to the volunteers then in service if they would re-enlist. The only conditions which the enrolling board, of which the district provost · marshal is the president, can demand compliance with, are : 1st. That the drafted man or volunteer is of the required age; and 2d. Able bodied. There is no power vested in any officer or department of the government, to demand of the recruit, or of any one in his behalf, compliance with any other condition. And if other conditions could be imposed, the effect must be to lessen the number of men who would otherwise be enlisted, to the great detriment of the public service. It seems to me, therefore, that in the absence of legislative authority, no one was authorized to impose conditions upon the volunteers, not specifically imposed by congress, and that this want of authority is presumed to have been known to the depositor, as well as to the defendant, as every man is presumed to know what the law of the land is. If, under these circumstances, there was no one who had the power to ratify the act of the defendant, (as I shall attempt hereafter to show,) unless it was congress itself, it would follow that had there been an agreement to wait until the defendant could inform his superiors at Washington, and until they should either expressly or impliedly ratify the act, it would not have availed the defendant; because, 1st. It does not appear that the attention of congress was called to the case; and, 2d. If it was, and they had ratified it, it would not relieve the defendant from his liability to the depositor.

A public agent, although he contracts in his own name, is not liable on contracts made by him for the government, while he acts within the scope of his authority, unless he agrees to become personally responsible. (*Paley's Agency,* 376, *and notes. Story on Agency,* § 302, *&c.*) But if such agent

exceeds his authority, or acts without it, he is personally liable, as is the agent of a private person under the like circumstances. (*Story's Agency,* § 307. *Elliott* v. *Swartout,* 10 *Peters,* 138. *Bond* v. *Hoyt,* 13 *id.* 263.) If a ratification of the act of the defendant could be of service to him, it remains to inquire who was authorized to ratify it, and whether it has been ratified by the department or officer of the government legally authorized to ratify and adopt the act of the defendant. I shall not repeat the reasons which induced me to believe that neither the war department nor the Provost Marshal General had power to authorize the requirement of a deposit by or on behalf of a drafted man, or volunteers, or those who desired to have substitutes mustered into the service. It was held in *The State* v. *The City of Buffalo,* (2 *Hill,* 434,) that the unauthorized act of a public agent may be ratified, with the same force and effect as the like act of a private agent. In that case the keeper of the state arsenal at Buffalo had loaned to the city arms belonging to the state, and had taken back a bond from the city, conditioned for the return of such arms when called for. The loan was wholly unauthorized; yet the court held that it was such an act as might be adopted and ratified, and that the bringing of the suit was evidence of such adoption. It was said by the learned judge, in declaring the opinion of the court, that there was no officer authorized to loan the arms, but that as the loan was made by a person who was not a public officer, but a mere private agent of the commissary general, the act might be ratified and the bond sustained. As to what officer or department of the government was competent to ratify the act, no opinion was expressed.

In *Delafield* v. *The State of Illinois,* (26 *Wend.* 192,) the state sued to recover back bonds issued by it, and which had been sold by the agents of the state, in violation of the act of the legislature authorizing the sale. The plaintiff in error, who was the defendant in the court below, sought to protect his title

by a ratification of the act of the commissioners who made the sale, by the governor and some other of the state officers, but the Court of Errors held that the officers named had not the power to ratify the act—that the legislature alone could do it. The argument of the court is that the power of the commissioners is set forth in the act authorizing the sale of the bonds, and every person dealing with them must be presumed to know the nature and extent of their powers, and they deal with such agents at the hazard of there being a want of authority to bind the principal, or a departure from it, and the act of the agent is void for the excess, as are the unauthorized acts of private agents; and as the authority in that case was conferred by the legislature, the act of the agent could only be ratified by it, and hence there could be no ratification by the state officers.

In a case between the same parties, (2 *Hill*, 159,) the same principles were applied, and in that case it was suggested that the test of the right to ratify the unauthorized act of a public agent is whether the defendant or officers by whom the ratification is claimed could have conferred on the agent the power to do the act in question. Applying this test, it was clear in that case that the state officers could not ratify the sale.

Applying the same test to this case, it is equally clear that no officer or department of the government, except congress, could have authorized the defendant to exact the deposit. Neither could either or any of them ratify it when done. As no foundation is laid in the evidence on which to rest a claim of ratification by congress, I shall not stop and consider it, especially as, if a ratification could be established, it would not shield the defendant from liability in this suit.

I can not agree with the appellant's counsel that the deposit was void as taken "*colore officii*," or as being against "public policy." Neither can I agree with the learned judge who tried the case that if the act was unauthorized by law

the parties were therefore "*in pari delicto*," and the plaintiff can not for that reason recover. This principle only applies when the act done is prohibited by law, or is "*malum in se.*" (*Chitty on Cont.* 658–9.) There are exceptions to the rule, even in these cases, but it is unnecessary to refer to them. Neither can I agree with the learned judge that the agreement is executed, and for that reason the plaintiff can not recover what his assignor may have delivered to the defendant under the illegal contract. The agreement was executory, and could not be said to be executed until the right of redemption is foreclosed. As well might the pawn broker insist that he could hold the pawn upon the ground of the contract being executed. In both cases the property is left in pursuance of a contract which is in one sense executed, when the pawn or pledge is delivered, on terms agreed upon between the parties, but it is not executed in the only sense in which the term is used in the law when the party is estopped from asserting a claim to the property pawned or pledged.

I am of opinion that the pledge was wholly without consideration, and that the plaintiff may recover the property pledged, and the judgment should therefore be reversed and a new trial ordered; costs to abide the event.

[Onondaga General Term, January 2, 1867. *Bacon, Mullin* and *Foster,* Justices.]