SNEED, J.,
concurred with the majority of the Court, but gave his own individual views:
*653 A Court of Equity will be slow to determine upon a doubtful state of facts, that the act of an agent, which is in positive violation of the terms and restrictions of the agency, has been ratified and adopted by the principal. And this is especially true with regard to an act which is positively injurious to the principal. The ratification of such an act must be clear and unequivocal. It must not depend upon a judicial interpretation of acts or words that are in themselves equivocal, uncertain or doubtful. The agent in this case was never the agent of the complainant to receive “Confederate money.” If any one fact is patent upon the face of this record, this fact is so. And it is a pregnant fact that should not for an instant be lost sight of in adjusting the equities of these parties. This case must repose then upon the doctrines of the Iuav in regard to assumed agencies. For it will not be pretended that the agent in this case acted otherwise than in utter disregard of the intention, understanding and instructions of the complainant. The principles governing this case are stated with clearness and undoubted correctness by Chancellor Kent: “ That where the principal, with knowledge of all the facts, adopts or acquiesces in the acts done under an assumed agency, he can not be heard afterward to impeach them, under the pretence that they were done without authority, or even contrary to instructions. When the principal is informed of what has been done, he must dissent, and give notice of it in a reasonable time; and if he does not, his assent and ratification will be presumed:” 2 Kent Comm., 801. An illus *654 tration is given of this doctrine in the case of a merchant of Palermo who wrote to a house at Marseilles that he had shipped goods consigned to them to be sold on his account. The ship being out of time, the consignees at Marseilles caused the cargo to be insured on account of their friend at Palermo, and gave him advice of it. He received the letter and made no reply, and the vessel arriving safe, he refused to account for the premium paid by the consignees, under the pretence they had insured without orders. But the reception of the letter and the subsequent silence were deemed by the law-merchant equivalent to a ratification of the act: 2 Kent Comm., 800.
It is said to be a principle quite universal that there can be no binding ratification without full knowledge — that it must be made understanding^: Culvee v. Artiley, 19 Pick., 300; Owings v. Hull, 9 Pet., 609; Copeland v. Mercantile Ins. Co., 6 Pick., 198. The ratification of an assumed agency may be express, or it may be inferred from the acts of the party to be effected. Booker v. Tolley, 2 Hum., 308; Lawrence v. Taylor, 5 Hill, 108; Hatch v. Taylor, 10 N. Hamp. R., 538. And if a contract be made, or an act done, for one, without authority, and the consideration of the contract, or act, or a benefit under it, be accepted and retained, or legally demanded, as by bringing suit by the principal, with full knowledge, it is a confirmation of the contract or act: 12 N. Hamp. R., 206; 5 Hill, 137; 5 Metcalfe, 192; 5 Dana, 530. And in general, the ratification of a part of a transaction, by claiming a benefit under it, is a ratification of the *655 whole, because it affirms the agency: Moss v. Mining Co., 3 N. Hamp. R., 67, 68; Newelll v. Hurlburt, 3 Vermont R., 351. And so it is held, that assent may he presumed from acquiescence after notice: Delafield v. State of Illinois, 26 Wend., 227. These familiar principles are relied upon to defeat the complainant in this cause, and I have stated them in their utmost strength. I do not controvert them, but, on the contrary, recognize them as the general rules of law upon the subject. But I reiterate it as a sound principle of law, that where an express ratification of an injurious act, without the scope of an agency, is relied upon, the act or expression upon which the ratification is predicated must not be of doubtful or equivocal import, but must be clear, certain, and definite; for the law will not presume the ratification of an injurious act in violation of the terms of an agency upon doubtful premises. In regard to an authorized agent, it is frequently said that the principal must disavow the act of an authorized agent beyond his authority promptly after notice, or he will be bound by it. But there is an important distinction to be observed here. This rule is only applicable where a loss may accrue from a delay on the part of the principal to disavow the agency, or when the transaction may turn out a profit or loss according to circumstances; but if the act attempted to be done is merely the imposition of a liability on the principal, and can prove only injurious to him, and the delay can do no injury to the other parties concerne'd,- a neglect to communicate his dissent will not necessarily render the *656 principal liable, and, at most, is only evidence to the jury of acquiescence, which they are not obliged to yield to. I find this doctrine stated in the case of Hutton et al v. Towns, 6 Leigh R., 47, 60, 61; vide Culon v. Ashley, 1 Am. L. C., 42; and I hold it to be a sound exposiiion of the law.
To determine, then, whether the complainant did by any act or expression of hers ratify the act of her agent in accepting Confederate treasury notes in payment of the check for $15,000 on the Jackson Insurance Company, we must consider first, the form and manner of her expression, and also the circumstances under which it was made. First, then, we have the repeated and positive statements to the defendant and to others in his presence that she would not receive Confederate currency for her land. If there was any one fact well known and well understood by the defendant and the agent in this transaction, it was that the complainant, who was about to part with her whole estate, would not under any circumstances receive any thing but sound funds for her property. This was undoubtedly, as we think, the understanding with which the .complainant sold and the defendant purchased. Her earnest protestations upon this subject could not have been misunderstood. There were reasons also for her solicitude in this respect, to which a Court of Equity will not and ought not to be blind in adjusting the equities of these parties. Her land was valuable. It was her all. A great civil war was flagrant, and West Tennessee and the city of Memphis, where these parties resided and where these negotiations were *657 had, were then on the eve of conquest and capture by the Eederal forces. The contract of sale was made on the 7th of May, 1862 — the northern outposts and defenses of Memphis were then being bombarded. The check was retained in the hands of the agent for nearly a week afterward. He intimated his fears to the complainant of its being paid in Confederate money. She went at once to the defendant and returned with the response that he said he would do what was right-about it. A Court of Equity will not ignore the fact also that by a public military order the ban of martial law was denounced against all persons of whatever sex or condition who should throw discredit upon Confederate currency. It was under these circumstances then — when the crisis of the war for that section of country was at hand; when every thing was thrown into confusion by military reverses and by the imminent fall of the city; when stout men as well as weak women were seeking safety in flight — that the agent, himself on the eve of flight, informed the complainant that the check had been paid in Confederate money, and asked what he should do with it. He says she was dissatisfied — that she has never been otherwise — but in the confusion and tremor and terror of that moment she told him to take it south and do the best he could with it.
"Was this a ratification of the agent’s act? We think not. We are not to presume that the complainant — a woman — unskilled in business transactions, and unused to the bufferings of business life, had not throughout these negotiations been inspired by the same *658 panic by the military orders which forbade the discrediting of Confederate' money, which prevailed among the other sex. She had been told by the defendant that it would all be right, and she was doubtless startled, as she had a right to be, by the announcement of her agent in that moment of exigency and peril. What could she do under such circumstances ? The Confederates still lingered in possession of the city. The men of substance who had identified themselves with the losing cause were fleeing to the south, and her agent among them. There was no redress in the Courts of justice. What did she mean by this remark to her agent? She did not dare to seek out the defendant in the teeth of these military orders and imperil her liberty by repudiating the payment. Did she intend then deliberately and advisedly to adopt it? We can not think so. If she had, her declaration would have been more certain and unequivocal. It seems to us that in those uncertain and trying times, when business was suspended, and money scarce, meditating as she did a flight to the south where this currency would yet purchase the necessaries of life, she would have accepted and taken possession of this money, or a portion of it, if she had intended this expression as a ratification of the j>ayment. But it does not appear that she ever touched a cent of it, and it does appear that she has from that moment expressed her profound dissatisfaction at the conduct of her agent. The appropriation of a portion of this money by her agent, in payment of a debt due from the complainant to him, does not in the slightest degree compromise *659 her. This is a transaction with which she had nothing to do, but as this payment has enured to her benefit, a Court of Equity would regard it as a legitimate credit to defendant. Nor do we think that the complainant’s purpose in 1863, of taking the $10,000 note to Memphis, with a view to its collection, even if such were clearly her intention, can be considered as a ratification of the Confederate money payment in 1862. On the contrary, this fact has tended to give greater strength to our convictions that she never did intend to ratify the payment. The acceptance of the note can upon no principle be held to be a ratification of the payment in Confederate money under the circumstances of this case. The note was a chose in action, which might eventually be collected in coin or other legal tender currency, while the cashing of the check in Confederate funds was no payment at all, and thus has the complainant treated it from the beginning. In 1863, the Federal army was in possession of the city of Memphis. The defendant was residing there. No other money was permitted to circulate within the Federal lines but gold coin or legal tender notes. If the complainant did in fact bring this note to Memphis for collection, she did so with a full knowledge that if paid at all, it must be paid in coin or a good currency, for which alone she had contracted to sell her land. And it is remarkable that, if she needed money, she would at such a time have encountered the perils of such a journey rather than draw upon the ample fund already in the south, if she had intended to adopt the act of her agent and *660 ■claim that fund as her own. Under all these circumstances, we can not presume a ratification of this transaction from such a remark, at such a time, of doubtful import, and made, doubtless, as an admonition to her agent, whose wrongful act she had continually reprobated — to take the worthless currency and •do the best he could for himself and not for her. If she had intended by that remark to have ratified her act, it is quite remarkable that there is no single act in reference to the fund by her, through a series •of years, while it was current and convertible into cotton and other valuable products, which would indicate such an interest. On the contrary, the record shows that she has never, from that time to this, spoken of it otherwise than with dissatisfaction. And at the close of the great civil war, when the Courts were opened, she has come into a Court of Equity to seek judicial redress, for a wrong of which she has never ceased to complain.
The case of Walker v. Walker, determined at the present term of this Court, was a case in which the plaintiff, a citizen of North Carolina, had obtained the services of his nephew in Tennessee, without compensation, to make some collections for him, with positive instructions to remit the money per express to the plaintiff in North Carolina. The defendant received these instructions, but in direct violation of them, but in the utmost good faith, adopted the advice of an attorney, and’ made the remittance in the check of G. W. Trotter & Co. on New York — these merchants in perfect credit in the city of Memphis. Before the *661 check reached the plaintiff by mail, the firm of Trotter & Co. became insolvent. The plaintiff, however, upon receiving the check, believing it to be good, at once wrote to his agent, the defendant, acknowledging the receipt of the check, and thanking him for his prompt attention in remitting the money. The check was at once sent to New York for collection, and Avas returned dishonored, and, thereupon, the plaintiff brought his action against the agent to recover the amount. He Avas permitted to recover by this Court, upon the ground that the loss Avas occasioned by the violation of the orders of the plaintiff in not sending the funds by express, and that the plaintiff’s reception of the check, and his letter adopting the act, was no ratification. This case, it was thought by some of us, carried the laAV to its utmost verge; but it can not be pretended that it presents such a case for the plaintiff as the case now in judgment.
These questions of ratification, while they are all referable to well settled principles of law, yet each must depend upon its own peculiar facts and surroundings. No one case can well be taken as a perfect precedent for another, for no two are alike. Upon the principles and for the reasons herein stated, I am thoroughly of opinion that the equities of these parties are Avitk the complainant, and I concur in the opinion of a majority of the Court as delivered by Judge Deaderick.